### HATTIE G. KYLES v. SOUTHERN RAILWAY COMPANY.

(Filed 22 April, 1908).

1. **Judgment—Nonsuit—Evidence, How Considered—Questions for Jury.**

    In consideration of the question as of nonsuit upon the evidence the courts will accept the evidence in the most favorable light to the plaintiff; and if there is any evidence, or if different minds can draw different conclusions, it is the duty of the trial Judge to submit the case to the jury.

2. **Dead Bodies—Unlawful Mutilation—Widow—Right of Action.**

    When a widow is living with her husband at the time of his death she has, nothing else appearing, a right of action superior to that of the next of kin for the unlawful mutilation of the remains of her deceased husband.

3. **Dead Bodies—Quasi Property—Wrongful Mutilation—Actionable.**

    While dead bodies are not recognized at common law as property, they are *quasi* property, and wrongful mutilation thereof is actionable.

4. **Same—Evidence—Punitive Damages, When Recoverable—Wantonness and Malice.**

    In a suit by the widow punitive damages are recoverable for defendant's breach of duty in knowingly permitting the mutilated and dismembered body of deceased to remain upon or along its track in an unprotected condition, to be repeatedly run over by its trains, when it was from a willful, wanton or malicious motive.

**5. Same—Evidence Insufficient.**

There is no evidence of a willful, wanton or malicious motive on the part of defendant or its employees when it appears that the deceased, who was killed by one of defendant's engines, was permitted to remain along defendant's track and was repeatedly run over and mutilated, and when it was done at night or under such conditions as to cause the employees not to be aware thereof.

**6. Same.**

Evidence that the section master manifested some impatience at the prospect of guarding the remains held incompetent.

ACTION tried before *Justice, J.,* and a jury, at November Term, 1907, of IREDELL.

Plaintiff appealed.   The facts are stated in the opinion.

*Armfield & Turner* and *H. P. Grier* for plaintiff.
*L. C. Caldwell* for defendant.

CLARK, C. J.   The complaint alleges (1) the careless and negligent mutilation of the dead body of plaintiff's husband by continuously running its train back and forth over it for nearly twenty-four hours after the killing, the body all this time lying exposed on the track between the rails; (2) the willful, wanton and reckless mutilation of the dead body of plaintiff's husband by above-recited conduct; (3) for negligent failure to gather up his remains for burial, in that a portion of his remains were not sent home, but lay alongside of the track for four days, till gathered up by relatives, who carried them home, reopened the grave and buried these remains with those which had been sent by the defendant company. There is no allegation of wrongful death or negligent killing, in which case the cause of action is created by the statute and is vested in the personal representative.   Revisal, sec. 59; *Killian v. Railroad,* 128 N. C., 261.

As the court below granted a nonsuit, if there is any evidence of either of the matters alleged, whether of willful and wanton or merely negligent misconduct, the nonsuit must be set aside, as they are not separate causes of action, and it is

not necessary to discuss the testimony further than to ascertain if there is evidence of the cause of action to submit the case to the jury. Matters in defense or in exculpation have no place here, but should be heard on the new trial below.

Was there any evidence of mutilation of the dead body of the deceased except that incident to the killing? If so, his Honor erred in not submitting the case to the jury. In considering this question the courts will accept the evidence in the most favorable light to the plaintiff, and if there is any evidence or if different minds can draw different conclusions, it is the duty of the trial Judge to submit the case to the jury. *House v. Railroad,* 131 N. C., 103; *White v. Railroad,* 121 N. C., 484; *Wittkowsky v. Wasson,* 71 N. C., 454; *Moore v. Railroad,* 128 N. C., 455. The body was found on the defendant's track—head, pool of blood, hair, eyeballs, etc., near the four-mile post from Salisbury; arms and legs 75 yards farther in direction of Salisbury, and the body 250 or 275 yards from head in the same direction; hair, blood and parts of body along track, inside and outside of the rails, for some distance; and evidence that body was dragged and knocked from one side of the track to the other; hair on angle bars or nuts where the rails are joined. The body was stripped of its head, legs and arms and all clothing; overcoat found near the place, torn and cut; a piece of it was found one mile east of the body, and a pocket west of Statesville, 27 miles therefrom, in a different direction. The drawers were picked up on the track one-fourth of a mile west from body. Between 9 o'clock on the evening of the 19th and 6 o'clock on the afternoon of the 20th the body and its fragments lay strewn up and down the track between the rails and were run over by every passing train. During this time fifteen or more trains passed over the defendant's track—six or more during the night and six or more during the day—after the defendant's agents discovered the body, and one train was seen to strike the body as it lay upon the track. The watch

that the deceased wore was mashed, and the hands pointed to
7½ minutes to 9 o'clock.    Train No. 12 passed the four-mile
post going towards Salisbury and the scene of the killing
about this time, with a full headlight.    The track was straight
for one mile each way and no object was discovered upon the
track, as the engineer swore.    Train No. 35, from Salisbury,
passed No. 12 near that city, and passed the four-mile post a
few minutes thereafter.    This last train evidently struck the
deceased first.    That the body was further mutilated is shown
by the fact that the headless body was 250 or more yards east
of the four-mile post; the drawers were found 1¼ miles west;
a part of the overcoat a mile east; pocket of overcoat 27 miles
west; arms 75 yards east and on north side of track; legs still
further east and on the south side of track; head near the
four-mile post, and hair all along down the track on angle
bars; trunk all rolled up in cinders and dirt, and mangled
and mutilated beyond recognition.    A dozen or more trains
passed over the body, as already stated, and one was seen to
strike it.    This evidence of all these things can hardly be
reconciled with the theory that *only one train struck the de-
ceased.*

The evidence indicates rather that the body was struck
after death by different trains going east and west, and that
it and parts thereof were thrown hither and thither, back-
wards and forwards, by the passing trains going in opposite
directions.    This was an infringement upon the legal right
of the plaintiff to have the body for burial in the condition in
which it was when life became extinct.    To hold otherwise
would be a violation of "rights and duties recognized by the
laws and usages of society as growing out of the natural rela-
tions of human beings to each other and the divine and human
laws which bind society together."    *Thayer, J.,* in *Fox v.
Gordon,* 16 Phila. (Pa.), 185.

All the employees of the defendant who participated in the
mutilation of the body were retained in the defendant's em-

ployment.    This was a ratification, and it cannot be heard to say that the act was unauthorized.    12 A. and E. (2d Ed.), 36 *et seq.*

The nonsuit, however, it seems, was granted, not on the ground of lack of evidence to support the allegations of fact in the complaint, but on the ground that they did not constitute a cause of action.    As this is the first time that such cause of action has been presented in the history of this Court, it is proper to review somewhat the authorities elsewhere which sustain the proposition that mutilation of a dead body entitles the surviving husband or wife (and if none, the next of kin) to recover compensatory damages for the mental anguish caused thereby, and, in addition, punitory damages, if such conduct was willful and wanton or in recklessness of the rights of others.

The right to the possession of a dead body for the purpose of preservation and burial belongs, in the absence of any testamentary disposition, to the surviving husband or wife or next of kin, and when the widow was living with her husband at the time of his death her right to the possession of the husband's body for such purpose is paramount to the next of kin. *Larson v. Chase,* 47 Minn., 307.    A widow has a right of action for the unlawful mutilation of the remains of her deceased husband.    *Larson v. Chase, supra;* 28 Am. State, 370; *Foley v. Phelps,* 37 N. Y. Supp., 471.

While a dead body is not property in the strict sense of the common law, yet the right to bury a corpse and preserve its remains is a legal right which the courts will recognize and protect, and any violation of it will give rise to an action for damages.    8 A. and E. (2d Ed.), 834, and cases cited; 13 Cyc., 280, and cases cited.    While the common law does not recognize dead bodies as property, the courts of America and other Christian and civilized countries have held that they are *quasi* property and that any mutilation thereof is actionable. *Larson v. Chase, supra.*

This is not an action for the negligent killing of the deceased, but an action by the widow [8 A. and E. (2d Ed.), 838, and cases cited] for the willful, unlawful, wanton and negligent mutilation of his dead body. She was entitled to his remains in the condition found when life became extinct; and for any mutilation incident to the killing the defendant would not be liable, but it is liable in law for any further mutilation thereof after death, if done either willfully, recklessly, wantonly, unlawfully or negligently. *Larson v. Chase, supra; Foley v. Phelps, supra; Railroad v. Wilson,* 123 Ga., 62; *Lindh v. Railroad* (Minn.), 7 L. R. A. (N. S.), 1018. Where the rights of one legally entitled to the custody of a dead body are violated by mutilation of the body or otherwise, the party injured may in an action for damages recover for the mental suffering caused by the injury. Perley Mortuary Law, 20; *Reniham v. Wright,* 125 Ind., 536; *Larson v. Chase, supra; Hole v. Bonner,* 82 Texas, 33.

In *Larson v. Chase,* 47 Minn., 311, it is said, discussing this cause of action: "Where the wrongful act constitutes an infringement of a legal right, mental suffering may be recovered for, if it is the direct, proximate and natural result of the wrongful act. It was early settled that substantial damages might be recovered in a class of torts where the only injury suffered is mental, as, for example, an assault without physical contact. So, too, in actions for false imprisonment, where the plaintiff was not touched by the defendant, substantial damages have been recovered, though physically the plaintiff did not suffer any actual detriment. In an action for seduction substantial damages are allowed for mental sufferings, although there be no proof of actual pecuniary damages other than the nominal damages which the law presumes. The same is true in actions for breach of promise of marriage. Wherever the act complained of constitutes a violation of some legal right of the plaintiff which always in contemplation of law causes injury, he is entitled to recover all dam-

ages which are the proximate and natural consequence of the wrongful act. That mental suffering and injury to the feelings would be the ordinary and proximate result of knowledge that the remains of a deceased husband had been mutilated is too plain to admit of argument." This case cites *Meagher v. Driscoll,* 99 Mass., 281, where a father recovered damages for mental anguish in digging up and removing the body of his child. *Chase v. Larson, supra,* is quoted and followed by many cases, among them *Foley v. Phelps,* 37 N. Y. Supp., 471. "Where the injury inflicted upon the plaintiffs was an unlawful and unwarranted interference with the right of decent burial, and such conduct was wanton or malicious or the result of gross negligence or reckless disregard of the rights of others, exemplary damages may be awarded." *Wright v. Hollywood,* 112 Ga., 884. This whole subject is fully reviewed, with full citation of authorities sustaining the right of action for compensatory damages for reckless indifference to the rights of others, by *Judge Dodge* in the late case (1905) of *Koerber v. Patek,* 123 Wis., 462-467. In *Lombard v. Lennox,* 155 Mass., 70, it is said: "If the ordinary and natural consequence of the tort is.to cause an injury to the feelings of the plaintiff, and if the acts are done willfully or with gross carelessness of the rights of the plaintiff, damages may be·recovered for mental sufferings." To same purport 1 Sedg. Dam. (8th Ed.), secs. 43-47; 1 Suth. Dam., secs. 95 *et seq.* The defendant also owed the plaintiff the duty to gather the body and its fragments and prepare the same for burial, and a negligent failure to do so was an infringement upon her legal rights, and therefore actionable. *Commonwealth v. Susquehanna Coal Co.,* 5 Kulp, 195 (Pa. case, 1889) ; *Scott v. Riley,* 40 Leg. Int., 382 (Pa. case). Parts of the body were left along the track and gathered up by the father on the Monday following.

It is no answer to such negligence or indifference to say that the defendant did not remove the body from the track

because the section master was waiting for the coroner. Humanity and decency required that the body and its scattered members should be reverently picked up, laid off the track in some nearby spot and sheltered by a covering from the sun and flies and dust and irreverent eyes, and protected from the dogs by some better agency than, according to the testimony, the volunteer aid of small boys attracted thither by curiosity, but who showed more respect for humanity than those who represented this defendant. On this condition of affairs being reported to the proper official, he should have seen that such steps were promptly taken as were required by decency and the respect shown in all civilized communities to the dead. It could in nowise aid the investigation of the coroner to expose the headless body on the track beneath the passing trains, becoming begrimed with cinders and dust beyond recognition, nor was there excuse for leaving the other portions of the body uncollected and scattered up and down the track, and for days even after a part of the body was sent home. Besides, there was negligence in keeping the body for eleven hours waiting for a coroner, when Salisbury was only four miles distant. The president of the defendant company was unfortunately killed on its track not long since. Was his body thus kept on the track to be run over by passing trains all day long, waiting for the coroner?

The above facts, if sustained on the trial, will entitle the plaintiff to recover damages for mental anguish for such indignities to the body of her husband, and punitive damages also, if the jury find that such conduct was willful and wanton or in reckless indifference to the rights and feelings of the plaintiff and to their own duties. The jury should, however, be cautioned (as in actions for delay in delivery of telegrams concerning sickness and death) to carefully dissociate this from the plaintiff's grief at learning of the death of her husband, for this action does not concern that phase of the case. Nor is the plaintiff entitled to recover anything for grief at

seeing the condition of the body in the coffin. She knew, or her friends should have told her, of the condition of the remains, and she herself is to blame that she chose to look in upon them. It may have been a natural impulse, but the defendant is not responsible for the mental anguish resulting therefrom.

Respect for the dead is an instinct that none may violate. The democracy of death is superior to the edicts of kings. Rizpah became forever famous among her kind when she defied the King of Israel, who would treat the bodies of her dead with contempt. Sophocles has immortalized Antigone, who vindicated the like sentiment of human nature as a higher law than that of her sovereign.

The deceased may have moved in the humbler walks of life, but to the plaintiff he was husband and the father of her children. It was her right, old as time, as broad as humanity and as deep as the heart of man, that his mortal remains should be treated with due respect. So far as the defendant, through its agents, recklessly, willfully or negligently failed to do this, it has violated her rights under the law. What damages will compensate her for the mental anguish the defendant's conduct has caused her, and what would be proper punitory damages for the recklessness, negligence or indifference of its agents (if proven), is a matter for a jury of her countrymen to determine, subject to the supervision of a just Judge, that an excessive sum be not assessed.

This action is brought by the widow of an employee of the Southern Railway Company. It is brought against the corporation and not against any of its employees. Employees of railroads render arduous and usually faithful service and are subject to many dangers, some of which cannot be avoided and some that can and should be. That they render faithful service when living is no excuse for indignities to their bodies when dead. The engineers on these passing trains could not risk their trains by stopping without orders. The responsibility for keeping this body on the track, with the attendant

and revolting details, rests not with them, but on some one "higher up."

HOKE, J., concurring.

BROWN, J., concurring: While I am of opinion that his Honor erred in sustaining the motion to nonsuit, the grounds upon which I base this conclusion are entirely different from those stated in the opinion of the Court.

The plaintiff claims damage of the defendant:

(1) For that the servants of the defendant, its engineers, willfully, wantonly and brutally mutilated the dead body of her husband.

(2) For the negligent failure to gather up his remains and prepare the same for burial.

A most careful examination of the record convinces me that there is no evidence to support the first allegation, either as against the engineers, the section master or any other employee of the defendant.

I should be loth to charge any man with the willful, wanton and brutal mutilation of the dead, much less those men who daily take their lives in their hands for our benefit and who belong to a profession whose unpretending, self-sacrificing heroism has been immortalized in song and story. Many of them, in endeavoring to save the lives of those committed to their care, have held an unfaltering hand upon the lever when they knew they were rushing onward to certain death. Many humble heroes of the throttle have, like Jim Bludsoe,

> "Held her nozzle ag'in' the bank
> 'Til the last galoot's ashore,"

and then died at the post of duty that others, whom they did not even know, might live.

The evidence, to sustain such an accusation and against such men, should be clear, not only as to fact of mutilation, but that the engineers of the defendant did it willfully, wantonly and therefore knowingly.

The evidence taken on the trial was all introduced by the plaintiff, and, as I read it, there is nothing to show a willful and wanton mutilation upon the part of any engineer of the defendant or any other employee of the defendant. It is admitted that the deceased was not killed through any negligence of defendant's servants, and no claim is made for such negligent killing.

The evidence tends to prove that plaintiff's husband, Robert Kyles, an employee of defendant, left Statesville on 19 January, 1905, on defendant's train for Landis, Cabarrus County, and that he intended to stop off somewhere that night *en route* to visit his aunt. It seems to be conceded that the deceased never reached Salisbury, and it appears that he was killed somewhere near the four-mile post from Salisbury. At that point blood, brains and hair were first discovered on the rail. Farther down the trunk of the body was found, rolled over and lying in between the rails and almost unrecognizable as that of a human being. The watch of the deceased was found near the four-mile post, mashed in and the hands stopped at 7½ minutes to 9. The engineer, Keever, of train No. 12, testifying for plaintiff, states that his train passed this spot at 8:53 P. M.; that his electric headlight was shining, and that he neither saw nor struck anyone on the track, and if he had struck a man with the pilot of his engine he would have known it. There is no evidence that the deceased was struck by any engine, and the condition of the body repels that theory. All the evidence tends to prove that the body was not thrown from the track by the pilot, but that the fragments of the body—limbs, blood, hair and clothing—were carried eastward for a mile or more from the point on the track where the evidence of his death was first seen. It was on an eastbound train that the deceased left Statesville on the evening of the 19th, and it is a most reasonable and in fact about the only legitimate inference to draw from the facts and circumstances in evidence that the deceased fell from the train upon which he was traveling, between the cars, and, becoming entangled

in the machinery under the cars, was ground up and his body crushed and dismembered in the running gear and rods under the cars, and his flesh and blood scattered for some distance along the track. It would require only a second or two to do this at the usual speed of a passenger train.

Assuming that during the night defendant's engines passed over the remains as they lay scattered along the track between the rails, it was ignorantly done upon the part of the engineers. It cannot be said to have been wantonly and willfully done unless knowingly done. There is not a *scintilla* of evidence that any engineer of defendant knew that the scattered *debris* of a human body were anywhere on the track until next morning. The only part of the remains found between the rails (nothing was found on the rails except blood and hair) was the trunk of the body, with an arm doubled up under it, and a hand and a foot and legs. The body was rolled over, lying in between the rails, in an unrecognizable mass. The witnesses testified that "it was a mighty hard matter to tell what the body was by itself." The legs were equally as difficult to recognize and were 100 yards west from the trunk. All the evidence shows that, if the engineers ran over these remains during the night, they not only did it ignorantly, but that no human eye could have discovered from the cab window of a rushing engine what they were.

As to the actual mutilation by passing engines during the day, after the remains were discovered to be those of a human being, there is hardly a scintilla of evidence, and absolutely nothing to indicate wanton and willful injury.

After the body was discovered next day the witnesses testify that the passing trains were stopped and passed slowly over the body without touching it, except in one instance. One witness states that in passing over the dead trunk between the rails an engine rod on one engine touched the shoulder, but did not cut or mutilate it. Why these remains were allowed to remain on the track all day is best explained by plaintiff's witness, J. M. Rice, who says:

"Q. Why was it you did not take his body off the track before that?

"A. We did not think we had any right to move it. People said not to move it until the coroner got there. Some said move it and others said don't until the coroner comes.

"Q. And after the coroner came the remains that had been found up to that time were picked up and taken to Salisbury?

"A. Yes, sir."

The persons who insisted on not touching the remains until the coroner came were the citizens of the neighborhood, and they were governed by what we all know to be a very prevalent error as to the requirements of the law. I fully agree with the learned counsel for plaintiff that the defendant owed the plaintiff the duty to gather the body of her husband and its fragments found on its track and to decently protect and prepare them for burial. A negligent failure to do so is an infringement of the plaintiff's legal rights and therefore actionable. Therefore, if the section master negligently permitted the remains to be exposed on the track and failed to properly care for them, the defendant would be liable to plaintiff in damages for such actual physical, including mental, suffering as she sustained by reason of the knowledge thereof, notwithstanding the fact that the section master acted in good faith and under a mistaken sense of duty.

If there was any evidence that the section master refused to remove the remains from a willful, wanton or malicious motive, I should say that, in addition to actual or compensatory damages, punitive damages would be allowable in the discretion of the jury. But there is no such evidence in the record. It is perfectly evident from the testimony of Rice and other witnesses that the section master failed to remove the body out of deference to the prevalent opinion that the coroner must first be sent for. Accordingly, as testified to by L. A. Rice, the section master left one of his men in charge of the body and went at once to Salisbury for the coroner and returned some time before the coroner arrived. The declara-

tions of the section master manifesting some impatience at the prospect of spending the night guarding the remains while waiting for the coroner were properly excluded. After the coroner arrived the remains were gathered up, under his direction, properly cared for and carried to Salisbury on the next train.

The details of this dreadful occurrence are well calculated to shock anyone and to disturb that judicial serenity and impartiality with which all cases should be considered. But I am glad to say, for humanity's sake, that a careful examination and mature consideration of the record convince me that, while the section master erred in his duty through an honest mistake, there is no evidence of willful, wanton, intentional or reckless brutality upon the part of anyone.

I think the judgment of nonsuit should be set aside and a new trial ordered along the lines laid down in this opinion, and it is so ordered.

WALKER and CONNOR, JJ., concur in the opinion of BROWN, J.