IDA BONAPARTE v. FRATERNAL FUNERAL HOME, CLARK S. BROWN, MANAGER, AND CLARK S. BROWN, INDIVIDUALLY.

(Filed 20 June, 1934.)

**1. Dead Bodies A a—Wife has right to possession of dead body of husband and may recover punitive damages for its wrongful detention.**

A wife has a right paramount to all other persons for the possession of her deceased husband's body, and where an undertaker, over the protest of the wife, holds the dead body of the husband and thereafter

embalms the same without the consent or approval of the wife, and upon demand of the wife, refuses to deliver the body until fees for personal services and embalming are paid, the wife may recover punitive damages for such detention.

**2. Dead Bodies B c—**

The arbitrary withholding of the dead body of her husband from a widow, as security for charges for personal services rendered by an undertaker and fees for embalming the body, is an unlawful act.

**3. Appeal and Error D a: New Trial C b—**

While an appeal to the Supreme Court is pending the trial court is without jurisdiction to hear a motion for a new trial for newly discovered evidence.

CIVIL ACTION, before *Hill, Special Judge,* at February Term, 1934, of FORSYTH.

On the night of 28 April, 1933, Cleveland Bonaparte was shot by a police officer. An ambulance was called to take him to the hospital and he died about the time the ambulance reached there. The plaintiff is the wife of the deceased and instituted this action to recover compensatory and punitive damages from the defendants for the unlawful and wrongful detention and mutilation of the body of her husband.

Plaintiff said: "On the night of 28 April, 1933, I was at my home. I saw Brack Dulin that evening about an hour and a half or two hours after the death of my husband. He came there and asked me for the body and said they had gotten it from the hospital and asked for the body, and I said, 'No, I want Mr. Fitch to have the body,' and I said, 'You all turn it over to Mr. Fitch.' I told them to not bother the body until I got down there or either I would send Mr. Fitch for the body. . . . He asked me if he should tack up crepe and I told him no, that Mr. Fitch would tack up crepe when he got there, and Dulin went out there and was going to tack it up anyhow, and Mrs. Johnson came out there and begged him not to and he took it down. . . . Later on that evening I went to the funeral home and made demand for the body of my husband to Mr. Brown—Clark S. Brown. . . . Mr. Brown told me he was working on the body embalming the body, and I said: 'I sent word down here for you not to bother the body until I came down here,' and he said, 'Well I'm working on the body and you can't get it.' I asked him twice for the body, and then they took me and put me in the car. I was so worried I just had broken down and they just took me out. . . . Robert E. Fitch was in there with me and came out to the car and talked to me later. Fitch got the body out about twelve o'clock or it may have been later than that. Before I got the body I had to pay Clark S. Brown $50.00 and I have a receipt for

the $50.00. Before I went to the funeral home I was in bed. While I was there I was so nervous and weak I couldn't hardly talk. After that my condition got worse. I never gave them any orders to embalm the body or to keep it, but they said they had orders to embalm the body but didn't say who gave them the orders. I had told Dulin not to do anything to the body except to turn it over to the Fitch Undertaking Company. I was at the place of business of Clark S. Brown and the Fraternal Funeral Home for an hour or a little over, trying to get the body. . . . When they got me home they had to put me to bed and tried to get a doctor, but it was so late they didn't get one until the next morning. . . . I did not see the body of my husband on that night. I asked at the Fraternal Funeral Home if I could see him and they said no, they were working on him. It was Clark Brown that told me that. I told him not to do anything else to the body but turn it over to Mr. Fitch. I don't know what the fifty dollars that I paid was for, but I was willing to pay five dollars for what they had done, going to the hospital and getting the body and taking it back to his place. I wanted Fitch Undertaking Company to look after the body of my husband because that was his request; he always said he wanted Mr. Fitch to have his body if he died first."

Fitch testified that he was manager of the Fitch Funeral Home and that he was called to the home of the plaintiff and requested to take charge of her husband's body. He said: "I went with Mrs. Bonaparte to Mr. Brown's office at the Fraternal Funeral Home. . . . When I went there with Mrs. Bonaparte that night it was for the purpose of getting her husband's body. . . . Brown told Mrs. Bonaparte the charges were $50.00, and I told her she would have to get it up. . . . She asked Brown who gave him orders to embalm her husband and he told her that it was his custom to go ahead and embalm bodies when they come in if the family is here. We always get the consent of the family before we do it if the family is reachable. . . . The regular price for embalming is $25.00. The ambulance charge or removal charge is $5.00. . . . I did not have $50.00 with me, but I returned with $50.00 in about forty-five minutes and paid it to Dulin for the embalming of Mr. Bonaparte. I paid it at the request of Mrs. Bonaparte. As a result of paying the $50.00 he turned the body over to us. . . . When we went to see Clark Brown that night he discussed the matter in a business-like way with me. Told me as soon as he was paid for his services he would release the body. . . . He was as cordial and nice to me as a man could be. . . . I am a competitor of Brown. I have gotten bodies from other funeral homes and paid them for the embalming."

The defendant testified that he carried the deceased to the Memorial Hospital and that when the physician pronounced him dead he took the body to his funeral home. He testified that "when I returned to the funeral home I sent one of my representatives over to the home of the deceased where I had received the body. He returned shortly and told me that the lady was in a tantrum, that she was very nervous and they didn't permit her to be seen. I jumped in my automobile and ran over there myself and when I reached the scene it was dark at the time, and a stout colored lady, a dark lady who resembled that lady right there, came to the door and said not to disturb Ida Bonaparte, that she was very nervous and couldn't be seen, and she said to take the body and do what I thought was necessary with it and she would be up to see me tomorrow morning. I then came back to the establishment and commenced embalming the body and did embalm it. Later that night Ida Bonaparte came into my place of business and told me she wanted Mr. Fitch to handle the job to bury her husband. . . . I told her my charges were $50.00, told her I had embalmed the body and rendered personal services, that I had removed the body from the City Memorial Hospital and had used personal service by sending a representative to her place to service her with door badge denoting a death in the home."

The following issues were submitted to the jury:

1. "Did the defendants wrongfully and unlawfully withhold from the plaintiff possession of the body of her deceased husband, as alleged in the complaint?"

2. "What actual or compensatory damages, if any, is the plaintiff entitled to recover of the defendants?"

3. "What punitive damages, if any, is the plaintiff entitled to recover of the defendants?"

The jury answered the first issue "Yes"; the second issue "$45.00," and the third issue "$400.00."

From judgment upon the verdict the defendants appealed.

*Williams & Bright for plaintiff.*
*Hosea V. Price and W. Avery Jones for defendants.*

BROGDEN, J. An undertaker, over the protest of the surviving wife, holds the dead body of the husband and thereafter embalms the same without the consent or approval of the wife, and upon demand of the wife, refuses to deliver the body until the fees are paid. Can such wife, upon such facts, recover punitive damages?

It was stated in the oral argument that the background of the case disclosed the business rivalry of competitive undertakers for posses-

sion of the body of the deceased. It was said of old that "Michael, the archangel, when contending with the devil, he disputed about the body of Moses," though the record does not disclose whether such contentions arose over the possession of the body for burial. Jude 9.

Our decisions upon the question involved are to the effect that the surviving wife has a property right or *quasi* property right in and to the body of her dead husband, which is paramount to the claim of any other person. Moreover, it is accepted law that she may recover punitive damages for the mutilation or unlawful detention of the body by a third party if such conduct is wilful, wanton, reckless or unlawful. Manifestly, the arbitrary withholding of the dead body of her husband from a widow, as a security for a debt, or for services rendered, is an unlawful act, even though courteously done. The Supreme Court of Washington spoke upon the subject in *Gadsbury v. Bleitz*, 233 Pac., 299. The Court said: "But we think that the holding of the body after the time for its cremation has passed, and claiming to hold it as a guaranty or as security for the payment of some indebtedness, is making a misuse of the body, just the same as its mutilation or improper burial. The misuse in one case may be greater in degree, but nevertheless it is a misuse." While the State of Washington has a statute prohibiting the detention of a dead body for debt, nevertheless the decision was not grounded exclusively upon the statute.

In the present case the evidence offered by the plaintiff tended to show that the widow, in deep distress from nervous shock, was compelled to wait an hour or two in the dead of the night to haggle and barter for the body of her husband. These facts invoke the principles of law heretofore applied in *Kyles v. R. R.*, 147 N. C., 394, 61 S. E., 278; *Floyd v. R. R.*, 167 N. C., 55, 83 S. E., 12. See, also, *Stephenson v. Duke University*, 202 N. C., 624, 163 S. E., 684; *Boyle v. Chandler*, 138 Atlantic, 273.

After giving notice of appeal to the Supreme Court, the defendants filed a motion for a new trial upon newly discovered evidence at the next term of the Superior Court, before such appeal had been heard. Judge Alley dismissed the motion for such new trial and such ruling is approved. *S. v. Edwards*, 205 N. C., 661. The same motion was made in this Court, but the record filed does not warrant the award of a new trial.

Affirmed.