[No. B087323. Second Dist., Div. Seven. Feb. 22, 1996.]

MAVIS WILSON et al., Plaintiffs and Appellants, v.
HOUSTON FUNERAL HOME et al., Defendants and Respondents.

**COUNSEL**

Edward M. Daley for Plaintiffs and Appellants.

Ford, Walker, Haggerty & Behar and Maxine J. Lebowitz for Defendants and Respondents.

## Opinion

**JOHNSON, J.**—Plaintiffs are the wife, daughter and sister of Melvin Wilson, deceased. Defendants are the Houston Funeral Home and its director, Willie Houston (sometimes referred to collectively as Houston.) Plaintiffs seek damages from Houston for breach of contract and fraud in connection with the burial service of Mr. Wilson. The trial court found plaintiffs' second amended complaint failed to state a cause of action and sustained Houston's demurrer without leave to amend. Plaintiffs appeal from the judgment of dismissal. We reverse and remand the matter to the trial court with directions to overrule the demurrers to the causes of action for breach of contract, breach of the covenant of good faith and fair dealing and fraud and to sustain the demurrers to the causes of action for unfair business practices and breach of fiduciary duty without leave to amend.

### Facts and Proceedings Below

Construed in the light most favorable to plaintiffs (*Westinghouse Electric Corp.* v. *Newman & Holtzinger* (1995) 39 Cal.App.4th 1194, 1199 [46 Cal.Rptr.2d 151]), the second amended complaint alleges as follows.

Melvin Wilson died on September 18, 1991. Two days later plaintiffs entered into a contract with Houston under which Houston agreed to handle the funeral and burial services. Attached to the complaint is a written contract between Houston and Mavis Wilson, the decedent's wife, providing for professional services, funeral home facilities, transportation, a casket and other items commonly associated with a funeral.

At the time the parties entered into the contract, Ms. Wilson showed Houston an insurance policy on Mr. Wilson and a check from a mortgage loan broker payable to her in the amount of $5,000. She was informed Houston did not foresee the necessity of any payment from her and the funeral and burial arrangements could be paid for out of the insurance policy. It was agreed Ms. Wilson would retain the $5,000 check and, should the need arise for Ms. Wilson to cash the check to pay for Houston's services, Houston would so inform Ms. Wilson and wait for payment until the check had cleared the bank.

The funeral service for Mr. Wilson was to be held in Los Angeles with burial the following day in Riverside. Houston conducted the funeral service

as scheduled. On the day of the funeral, Houston asked Ms. Wilson if she still had the $5,000 check. She stated she did and that she had been informed it would take three days for the check to clear once it was deposited. Houston did not request any payment from Ms. Wilson at that time or request she deposit the check to make funds available.

On the day following the funeral, plaintiffs gathered at Ms. Wilson's home to await the arrival of Houston's limousine to take them to the burial service in Riverside. While they were waiting an employee of Houston called Ms. Wilson and again inquired if she still had the check. Ms. Wilson informed the caller she had the check and repeated that it would take three days for the check to clear the bank once it was deposited. The caller did not ask Ms. Wilson to deposit the check or to make any payment to Houston but informed her the limousine was on the way to take her to the cemetery in Riverside.

When the limousine arrived the plaintiffs got in believing they were going to Riverside for the burial service. The limousine, however, drove past the mortuary without stopping to join the hearse carrying the body. Plaintiffs asked the driver where they were going and he replied, "Willie Houston wants to see you." At this point plaintiffs became fearful and frightened because, despite their insistence they be taken to the mortuary, the driver refused to stop or turn around.

Eventually the limousine arrived at a bank where plaintiffs were met by Willie Houston. Houston asked Ms. Wilson if she had the check with her. She told him she did. Houston then shouted at Ms. Wilson: "Give me the check!" Ms. Wilson gave Houston the check and he told her to accompany him into the bank. Once in the bank, Houston went from teller to teller trying to persuade one to cash the check. When none would do so, Houston shouted in a voice loud enough to be heard by plaintiffs and the bank employees: "I want my money and I want it now! Ain't nobody going nowhere until I get paid." This statement caused plaintiffs to fear they might never be taken to the cemetery or allowed to bury the decedent.

Plaintiffs were detained at the bank, unable to leave, for 45 minutes to an hour while Willie Houston tried to cash Ms. Wilson's check. Finally, a bank employee agreed to allow Houston to cash or deposit the check if he purchased a cashier's check payable to Ms. Wilson for the amount in excess of the burial charges he claimed were due. Prior to this incident at the bank plaintiffs had never been told they had to negotiate the check or make any payment to Houston.

After leaving the bank, plaintiffs were driven to the mortuary where the casket, which they were told contained Mr. Wilson, was loaded into a

hearse. Plaintiffs were refused permission to check to make sure Mr. Wilson's body was in the casket.

Burial services were eventually held that day for Mr. Wilson. However, on the way to and from Riverside the limousine driver drove in a reckless manner reaching speeds of approximately 90 miles per hour, weaving in and out of traffic and tailgating, all the while eating grapes and spitting the seeds out the window. Plaintiffs repeatedly asked the driver to slow down but he ignored them. Despite the 90-degree temperature, the driver also ignored plaintiffs' requests to roll up the window and turn on the air conditioning. The driver's conduct caused Ms. Wilson's daughter to hyperventilate and caused shock, fear and emotional distress to all the plaintiffs who remained hot, sweaty and frightened from Riverside to Los Angeles.

Plaintiffs filed their original complaint in this action on September 23, 1993. The second amended complaint, at issue here, claimed damages based on breach of written and oral contracts, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, fraud and unfair business practices.[1] Houston demurred to the second amended complaint on the ground it failed to state any cause of action and moved to strike the portions of the complaint seeking an award for emotional distress and punitive damages. The trial court sustained the demurrer without leave to amend and ordered the action dismissed. The court did not rule on the motion to strike. Plaintiffs filed a timely appeal from the judgment of dismissal.

## DISCUSSION

### I. *Standard of Review.*

■ For purposes of this appeal we accept as true the properly pled factual allegations of the complaint. (*Thompson* v. *County of Alameda* (1980) 27 Cal.3d 741, 746 [167 Cal.Rptr. 70, 614 P.2d 728, 12 A.L.R.4th 701].) Furthermore, the allegations of the complaint must be read in the light most favorable to the plaintiff and liberally construed with a view to attaining substantial justice among the parties. (Code Civ. Proc., § 452; *King* v.

---

[1]Earlier claims for intentional infliction of emotional distress and false imprisonment were dropped from the second amended complaint as it was clear from the face of the original complaint these claims were barred by the one-year statute of limitations. (Code Civ. Proc., § 340, subd. (3).) (But see discussion below on false imprisonment as a breach of the implied covenant to provide an appropriate and dignified burial service.) Plaintiffs' brief on appeal does not address the purported cause of action for unfair business practices; thus any error in sustaining the demurrer as to this cause of action is deemed waived. (*Troensegaard* v. *Silvercrest Industries, Inc.* (1985) 175 Cal.App.3d 218, 228 [220 Cal.Rptr. 712].)

*Central Bank* (1977) 18 Cal.3d 840, 843 [135 Cal.Rptr. 771, 558 P.2d 857].) With these considerations in mind, we review the complaint de novo to determine whether it alleges facts sufficient to state a cause of action under *any* legal theory.

II. *The Trial Court Was Not Prevented by Its Own Local Rules From Hearing an Untimely Demurrer.*

■ Plaintiffs contend the trial court should not have considered Houston's demurrer to the second amended complaint because it was untimely under rule 7.7 of the Superior Court of Los Angeles County Rules. Rule 7.7(a)(3) provides that where a demurrer has previously been sustained with leave to amend, as occurred in this case, the defendant has 20 days in which to respond to the amended pleading. Houston's demurrer to the second amended complaint was filed beyond the 20-day time limit.

Superior Court of Los Angeles County Rules, rule 7.7(c) provides that if a timely response is not filed, the plaintiff may request an order to show cause why sanctions should not be imposed. Plaintiffs did not request sanctions and the trial court is not required by rule 7.7 to issue an order to show cause on its own motion. Thus, the trial court did not err in hearing the demurrer. Furthermore, a contention the complaint fails to state a cause of action is never waived and could have been raised at a later stage in the proceedings such as by a motion for judgment on the pleadings or for summary judgment. Therefore, plaintiffs suffered no prejudice by the court's consideration of the demurrer even though it was filed beyond the time specified in the local rules.

III. *The Complaint States a Cause of Action for Breach of the Implied Covenant to Provide an Appropriate and Dignified Burial Service.*

A. *California Recognizes an Implied Covenant to Provide an Appropriate and Dignified Burial Service.*

■ In contending the complaint fails to state a cause of action for breach of contract, Houston relies on its written contract attached to the complaint which specifically provides Houston will transport the body and the family to Riverside for burial services. The complaint does not allege Houston failed to transport the family and the decedent's remains to the cemetery on the agreed upon date. Therefore, Houston concludes, plaintiffs have failed to allege a breach of contract.

We disagree with such a narrow view of the contract between a mortuary and the bereaved family of the deceased.

A contract for burial services involves more than just driving the family to the cemetery to watch a box being dropped in a hole. ■■■ Rather, as our Supreme Court has observed, ". . . the mortuary defendants undertook to provide appropriate and dignified services of the type that bereaved family members normally anticipate. Those services are not limited to the conduct of [the] funeral rites, but extend through arranging the commitment of the remains through burial . . . ." (*Christensen* v. *Superior Court* (1991) 54 Cal.3d 868, 886 [2 Cal.Rptr.2d 79, 820 P.2d 181].) It is well recognized the real objects of the agreement between the family and the mortuary are consolation, consideration, dignity and peace of mind. (*Christensen, supra*, 54 Cal.3d at p. 895; *Allen* v. *Jones* (1980) 104 Cal.App.3d 207, 211 [163 Cal.Rptr. 445]; *Cohen* v. *Groman Mortuary, Inc.* (1964) 231 Cal.App.2d 1, 3 [41 Cal.Rptr. 481]; Leavitt, *The Funeral Director's Liability for Mental Anguish* (1964) 15 Hastings L.J. 464, 491-492 (hereafter *Funeral Director's Liability*).)

While the bereaved family members reasonably expect dignity, tranquillity and personal consolation in the handling of funeral services they rarely, if ever, express these expectations in a written contract. As a rule, those contracting for a mortuary's services lack the time and the frame of mind to enter into negotiations over a written contract. The parties orally agree to much of what is to be done and the mortuary follows its common practices as to the rest. (See *Funeral Director's Liability, supra*, 15 Hastings L.J. at p. 481.)[2] Furthermore, from the nature of his calling and experience the funeral director knows patrons expect dignity and respect for the deceased and themselves in the course of arranging and conducting the funeral services. This is, after all, the chief theme of a mortuary's advertisement and promotion. (*Christensen* v. *Superior Court, supra*, 54 Cal.3d at p. 895; *Funeral Director's Liability, supra*, at pp. 465, 476.)

Accordingly, there is implied in every contract for funeral services a covenant the services will be conducted with dignity and respect toward the family members for whose benefit the services are performed. (*Christensen* v. *Superior Court, supra*, 54 Cal.3d at p. 895; *Allen* v. *Jones, supra*, 104 Cal.App.3d at p. 211.) In *Allen* v. *Jones* plaintiff sued the defendant mortuary for breach of contract after it lost the remains of plaintiff's brother. In explaining why the plaintiff was entitled to damages for emotional distress for this breach of contract the court described the nature of the contract between the parties: "A contract whereby a mortician agrees to prepare a

---

[2]To prevent mortuaries from taking unfair advantage of potential patrons at a time when they may be confused, distracted and unable to withstand pressure, California law requires the funeral director to provide a written memorandum containing the charges for certain specified services before entering into a contract for those services. (Bus. & Prof. Code, § 7685.2.)

body for burial is one in which it is reasonably foreseeable that breach may cause mental anguish to the decedent's bereaved relations. 'One who prepares a human body for burial and conducts a funeral usually deals with the living in their most difficult and delicate moments . . . . So true is this that the chief asset of a mortician and the most conspicuous element of his advertisement is his consideration for the afflicted. *A decent respect for their feelings is implied in every contract for his services.*' " (104 Cal.App.3d at p. 211, quoting from *Fitzsimmons* v. *Olinger Mortuary Ass'n* (1932) 91 Colo. 544 [17 P.2d 535, 537], italics added.) The language of *Allen* v. *Jones* was quoted with approval in *Christensen* v. *Superior Court, supra,* 54 Cal.3d at page 895.[3]

### B. *The Complaint Alleges Facts Sufficient to Constitute a Breach of the Covenant to Provide an Appropriate and Dignified Burial Service.*

Houston next argues even if it impliedly covenanted to provide an appropriate and dignified burial service, the facts pled fail to establish it breached that covenant. Houston stresses this is not a case based on emotional distress resulting from a lost or desecrated corpse. Rather, it is a case based on the plaintiffs' alleged emotional distress from having to wait 45 minutes at the bank and from some "rude and uncouth" behavior by the limousine driver on the drive back from the burial. Houston contends its actions to obtain payment for its services were reasonable. As to the limousine driver, Houston contends his behavior amounted to nothing more than a petty annoyance. Houston suggests if the plaintiffs' complaint states a cause of action the courts will be flooded with trivial law suits by everyone who has ever waited in a long line at the Department of Motor Vehicles (DMV) or ridden with a rude taxi driver.

We do not believe plaintiffs' allegations can be brushed aside so easily. Unlike the relationship between the DMV and the public or the cab driver and his fare, "[d]efendants here assumed a duty to the close relatives of the [decedent] for whose benefit they were to provide funeral and/or related services. They thereby created a special relationship obligating them to perform those services in the dignified and respectful manner the bereaved expect of mortuary . . . operators." (*Christensen* v. *Superior Court, supra,* 54 Cal.3d at pp. 890-891.)

---

[3]The covenant to provide an appropriate and dignified service implied in funeral contracts may be viewed as a particular expression of the covenant implied in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement. (See *Comunale* v. *Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 658 [328 P.2d 198, 68 A.L.R.2d 883].)

### 1. *False Imprisonment.*

There can be no doubt false imprisonment of the bereaved family would be a breach of the covenant to perform funeral services in a dignified and respectful manner. ██ ██ False imprisonment is a willful and wrongful interference with the freedom of movement of another against his will. (See Pen. Code, § 236; *Parrott* v. *Bank of America* (1950) 97 Cal.App.2d 14, 22 [217 P.2d 89, 35 A.L.R.2d 263].) " 'Any exercise of force, or express or implied threat of force, by which in fact the other person is deprived of his liberty or is compelled to remain where he does not wish to remain, or go where he does not wish to go, is [false] imprisonment.' " (*People* v. *Agnew* (1940) 16 Cal.2d 655, 659-660 [107 P.2d 601].)

Plaintiffs allege they entered the limousine believing they were being driven to Riverside for Mr. Wilson's burial services. Instead, they were driven against their will and over their protests to Willie Houston's bank. From these facts a jury could find the plaintiffs were deprived of their liberty and compelled by force to go where they did not wish to go.

The complaint further alleges once plaintiffs arrived at the bank they were compelled to remain there against their will. The complaint quotes Willie Houston as shouting, "I want my money and I want it now! Ain't nobody going nowhere until I get paid." The restraint necessary for false imprisonment may be effectuated by any form of "unreasonable duress" for any " ' "appreciable . . . time, however short." ' " (*Fermino* v. *Fedco, Inc.* (1994) 7 Cal.4th 701, 715 [30 Cal.Rptr.2d 18, 872 P.2d 559].) Willie Houston's statement no one was going anywhere until he got paid could reasonably have been interpreted by plaintiffs to mean there would be no burial service until he received the payment he was demanding. Under these circumstances the plaintiffs could not have simply walked out of the bank and hailed a taxi to take them home. To do so would have been to abandon the remains of their loved one to an uncertain fate at the hands of Houston. A reasonable jury could find from the circumstances the plaintiffs remained at the bank under duress. A jury could also find a period of 45 minutes to an hour was a sufficiently long detention to constitute false imprisonment. (Cf. *Alterauge* v. *Los Angeles Turf Club* (1950) 97 Cal.App.2d 735, 736 [218 P.2d 802] (15 minutes an appreciable length of time to establish false imprisonment.) Finally, even if Willie Houston believed in good faith he was entitled to plaintiffs' $5,000 check, the provocation, motive and good faith of the defendant are irrelevant to pleading a cause of action for false imprisonment. (*Collins* v. *Owens* (1947) 77 Cal.App.2d 713, 716 [176 P.2d 372].)

### 2. *Holding a Body as Collateral for a Debt.*

Contrary to Houston's claim it acted reasonably in detaining Mr. Wilson's body until its bill had been paid, courts in other jurisdictions have described

holding a body hostage for payment of a debt as "morally reprehensible" (*Levite Undertakers Co.* v. *Griggs* (Ala. 1986) 495 So.2d 63, 64) and "refined cruelty and willful wrong" (*Gadbury* v. *Bleitz* (1925) 133 Wash. 134 [233 P. 299, 300, 44 A.L.R. 425]). (See also *Bonaparte* v. *Fraternal Funeral Home* (1934) 206 N.C. 652 [175 S.E. 137, 139].) The courts in *Levite* and *Gadbury* also noted the defendants' conduct violated state statutes similar to California's Health and Safety Code section 7053 which provides, "Every person who . . . attaches, detains, or claims to detain any human remains for any debt or demand . . . is guilty of a misdemeanor."

In *Levite Undertakers*, *supra*, the decedent's body was removed from his home by the defendant, Levite. Shortly thereafter the decedent's son and daughter went to the mortuary to view the body and select a casket. Dissatisfied with Levite's explanation of its services and the prices quoted, the son and daughter arranged for funeral services with a different mortuary and asked Levite to turn over the body. Levite refused to do so until it received payment for the services it had already rendered. The decedent's wife, son and daughter subsequently brought an action for outrageous conduct, wrongful and intentional detention of the body and negligence and wantonness in the care of the body. The jury returned a verdict for the plaintiffs and Levite appealed. In affirming the judgment, the Alabama Supreme Court stated: "Irrefuted evidence was presented which shows that Levite refused to turn over the deceased's remains to the family until a debt was satisfied. Not only is such activity morally reprehensible, but it also is prohibited by statute." (495 So.2d at pp. 64-65.)

In *Gadbury*, *supra*, plaintiff contracted with defendant to conduct the funeral services and cremate the body of her deceased son. The funeral services were held and paid for. However, plaintiff learned two weeks later her son's body had not yet been cremated and defendant would not perform the cremation until plaintiff paid it for funeral services previously rendered to another relative. In the plaintiff's suit against defendant for emotional distress, the trial court granted judgment for defendant on the ground the plaintiff could not recover damages for emotional distress unless the distress was accompanied by physical violence. In reversing, the Supreme Court of Washington stated: "[T]he holding of the body after the time for its cremation has passed, and claiming to hold it as a guaranty or as security for the payment of some indebtedness, is making a misuse of the body, just the same as its mutilation or improper burial . . . . It may be said that it is hard to conceive of more refined cruelty and willful wrong than that which the evidence shows was practiced in this case. It is doubtful if any threat could be more calculated not only to compel payment of the debt, but also to produce mental anguish and suffering, and it was thought that by first

creating the suffering payment would follow to put an end to the mental torture." (233 P. at p. 300.) (See also *Bonaparte* v. *Fraternal Funeral Home*, *supra*, 175 S.E. at p. 139 [widow entitled to punitive damages where forced to barter with mortuary for the body of her husband which mortuary refused to release until its bill was paid].)

In the present case plaintiffs allege that instead of delivering Mr. Wilson's body to Riverside for burial, Houston retained the body at its mortuary and expressly refused to perform the burial until it was paid for its services. Furthermore, even after plaintiff surrendered the $5,000 check to Houston in payment for the services, Houston continued to hold the body and refused to conduct the burial services while Willie Houston shouted and haggled with his bank over cashing the check despite having been told on numerous occasions there would be a three-day hold before the funds were available. We believe a reasonable jury could find such conduct violated the covenant to provide an appropriate and dignified burial service.

### 3. *Limousine Driver's Unprofessional Conduct.*

As to the conduct of the limousine driver, Business and Professions Code section 7707 proscribes "unprofessional conduct in the practice of funeral directing." Clearly, such unprofessional conduct would be a breach of the covenant to provide an appropriate and dignified burial. "Unprofessional conduct" is not defined in the statute or by California case law. The Pennsylvania Supreme Court, however, construed a similar statute as referring to "the breach of any of the generally accepted canons of ethics and propriety governing the respectful and reverential burial of the dead." (*Beatty* v. *State Board of Undertakers, etc.* (1945) 352 Pa. 565 [43 A.2d 127, 128].) We believe a jury could find driving the bereaved family down the freeway at 90 miles per hour, weaving in and out of traffic and tailgating while at the same time eating grapes and spitting the seeds out the window constituted unprofessional conduct and, therefore, a breach of the implied covenant to provide an appropriate and dignified burial service.

### C. *The Inconsistencies in the Pleadings Regarding Payment for Houston's Services Do Not Negate Plaintiffs' Cause of Action.*

Houston contends the pleadings contain factual contradictions regarding payment for its services and the allegations in the second amended complaint were an impermissible attempt to suppress facts regarding payment alleged in the earlier complaints which destroy the cause of action for breach of contract. (See *Kiseskey* v. *Carpenters' Trust for So. California*

(1983) 144 Cal.App.3d 222, 228 [192 Cal.Rptr. 492] ["An amended complaint may be rendered defective by proof of attempted suppression in it of destructive matter set forth in a superseded pleading."].)

We have reviewed the inconsistencies pointed out by Houston and have determined they do not affect plaintiffs' cause of action.

In the original and first amended complaints, plaintiffs alleged "on both the day of the funeral and the following day of the burial, *defendants inquired from plaintiffs as to the payment* and plaintiff Mavis Wilson informed defendants that she still had [the] loan check *and it could be deposited at anytime* but a three-day hold for clearance was necessary. Defendants agreed to wait three days for clearance of the check." (Italics added.) In the second amended complaint, plaintiffs alleged on the day of the funeral and again on the day of the burial Houston asked Ms. Wilson "*if she still had* [the loan] check." (Italics added.) The allegation "defendants inquired from plaintiffs as to the payment" was not included in the second amended complaint.

Houston argues the allegation "defendants inquired from plaintiffs as to the payment" can only be construed as an admission that on the day of the funeral and on the next day prior to the arrival of the limousine, plaintiffs were asked by Houston how they intended to pay for the services and the loan check was discussed as a manner of payment. This is one possible interpretation. Another plausible interpretation is that Houston inquired whether Ms. Wilson still had the loan check available as a means of payment should it become necessary. This interpretation is consistent with the allegations in each pleading Ms. Wilson told Houston she had the check, there would be a three-day wait for the funds after she deposited it and that Houston agreed it would wait for the check to clear. We note there is no allegation in any of the versions of the complaint that Houston told Ms. Wilson she would need to use the proceeds of the check to pay for the services or that she should deposit the check to start the three-day waiting period running. In any event, as we have explained above, at the demurrer stage the complaint must be construed in the light most favorable to the plaintiff. Arguments about what could or could not be inferred from the alleged facts must await the trial.

Furthermore, even if we were to accept Houston's interpretation of the conversations between the parties, we fail to see how it would defeat plaintiffs' cause of action for breach of contract based on the improprieties and indignities inflicted on them in the course of the burial service. Assuming the parties discussed payment for Houston's services out of the loan

check, the plaintiffs have pled consistently that Houston was informed at the time the contract was entered into there would be a three-day hold on the check before the funds became available. Therefore, Houston knew even if Ms. Wilson deposited the check on the day of the funeral the funds would not be available until three days later. Houston reasonably could not expect payment on the day of the funeral or the following day.

IV.  *The Complaint States a Cause of Action for Fraud Based on Houston's Misrepresentations Regarding Payment for Its Services.*

█ Houston's demurrer to the fraud cause of action focused on paragraph 49 of the second amended complaint which alleged: "[D]efendants at the time of contracting to provide death care services specifically represented to plaintiffs that they were fully capable of handling and processing the defendants [*sic*] insurance policy and that they would provide for a dignified and respectful funeral and burial service and that said representation [*sic*] was false." Houston correctly observes that, unlike other causes of action, the elements of a fraud cause of action must be pled with specificity. (*Committee on Children's Television, Inc.* v. *General Foods Corp.* (1983) 35 Cal.3d 197, 216 [197 Cal.Rptr. 783, 673 P.2d 660].) Houston contends the complaint fails to allege any facts showing it was not "capable of handling and processing" the insurance policy and the alleged representation the funeral services would be "dignified and respectful" is too general and amorphous to serve as the basis for a fraud cause of action.

If these were the only allegations of misrepresentation, we would tend to agree Houston's demurrer to the fraud count had merit. However, as plaintiffs point out in their opening brief, the fraud cause of action incorporates by reference the earlier allegations regarding Houston's representations regarding the time and manner of payment. The complaint alleges Houston represented to plaintiffs if the need arose for plaintiffs to cash the loan check it would so inform them and wait whatever time was necessary for the check to clear the bank. The complaint alleges this representation was false as evidenced by Willie Houston's conduct at the bank and prior similar conduct toward other families with whom Houston contracted for burial services. We find these allegations are sufficiently specific to satisfy the pleading requirements of a false representation and knowledge of falsity.

Houston does not challenge the pleading of the other elements of a fraud cause of action—intent to defraud, justifiable reliance and damages. Therefore, we conclude the trial court erred in sustaining the demurrer to the fraud cause of action.

V. *The Complaint Fails to State a Cause of Action for Breach of Fiduciary Duty.*

Plaintiffs seek to hold Houston liable on a theory of breach of fiduciary duty by an agent. For the reasons explained below, this theory is not applicable under the facts of this case.

"An agent is one who represents another, called the principal, in dealings with third persons." (Civ. Code, § 2295.) The funeral director or mortuary may be said to be acting as the agent of the family in carrying out the family's statutory duty to the state to bury its dead. (Health & Saf. Code, § 7100.) This duty is based on considerations of public health and sanitation, and the interest of the state in avoiding the expense and involvement of supervising the burying of abandoned dead. (*Christensen* v. *Superior Court,* *supra,* 54 Cal.3d at p. 897, fn. 24.) As the court in *Christensen* said, "[T]he relationship between the family of a decedent and a provider of funeral-related services exists in major part for the purpose of relieving the bereaved relatives of the obligation to personally prepare the remains for burial or cremation." (54 Cal.3d at p. 886.)

We have found no case in California or any other jurisdiction holding a mortuary owes a fiduciary duty to the family of the decedent. Nevertheless, the mortuary, as the family's agent for the fulfillment of its statutory obligations, may owe the family a fiduciary duty in connection with the preparation and expeditious disposal of the decedent's remains. We need not decide this issue here, however, because in this case the alleged breach of duty did not arise out of Houston's failure to properly prepare and dispose of Mr. Wilson's remains. Rather the alleged breach of duty is the failure to provide the family with an appropriate and dignified burial service. In our view, this duty cannot properly be described as a fiduciary one. Rather, as we have explained above, it is a duty arising from the mortuary's "special relationship" with the family by virtue of the nature of the services the mortuary agrees to perform beyond mere disposal of the body in conformity with legal requirements. (*Christensen* v. *Superior Court, supra,* 54 Cal.3d at pp. 882, 886, 891.)

The trial court, therefore, properly sustained the demurrer to the cause of action for breach of fiduciary duty.

### DISPOSITION

The judgment of dismissal is reversed. The matter is remanded to the trial court with directions to overrule the demurrers to the causes of action for

breach of written contract, breach of the covenant of good faith and fair dealing and fraud and to sustain the demurrers to the causes of action for breach of fiduciary duty and unfair business practices. Appellants are awarded costs on appeal.

Lillir, P. J., and Woods (Fred), J., concurred.