[No. G006742. Fourth Dist., Div. Three. Jan. 18, 1990.]

BRUCE STOKES et al., Plaintiffs and Respondents, v.
KENNETH H. HENSON, JR., Defendant and Appellant.

COUNSEL

Kenneth H. Henson, Jr., in pro. per., Menke, Fahrney & Carroll and James M. Duarte for Defendant and Appellant.

Anderson, Goldberg & Waldron and Gary A. Waldron for Plaintiffs and Respondents.

OPINION

**SONENSHINE, J.**—Kenneth H. Henson, Jr., appeals a judgment in favor of a group of investors. The investors[1] were granted rescission of their investment agreements with Henson and damages for violation of Corporations Code sections 25110 and 25401; in the alternative, they were granted damages in a like amount for breach of fiduciary duty and constructive fraud. Punitive damages were also awarded. Henson contends the rescission action was barred by statute and there was insufficient evidence to support all other causes of action and the awards themselves. We affirm.

I

The following factual recital is taken from the statement of decision. Henson derived his "income through investment activities on behalf of himself and others" whom he met through his tax service and various "social contacts, particularly his church." He "involved individual Plaintiffs in a number of different investment vehicles including commodities groups, Accountants Service Center, and a gold mine." In late 1980, he was offering commodities through "group accounts," accumulating funds from a number of people and investing them in his name through his own trader, Boston Trading Group.

"The investors had no say or control over their funds, the nature or types of commodities they invested in, or the specific workings of the Henson

---

[1] The plaintiffs/investors were Bruce and Linda Stokes, John and Loretta Madala, Gary and Diane Heald, James and Cecelia Rizzo, Michael Pashley, Ronald and Carole Kain, Frank Hale, Jr., Jim and Gail Wolfe, and Michael and Sheryl Michelon.

accounts. . . . In each case, except the Wolfes, Henson received five percent (5%) of the amount invested to cover 'personal expenses.' He was also to receive twenty-five percent (25%) of any profit earned on the investors' funds." As an inducement to investing with him, Henson "personally guaranteed" a 25 percent return over the first year, i.e., if the account failed to perform sufficiently, "he would pay them the guaranteed return from his personal assets." No risks were explained to the plaintiffs, who were generally unsophisticated and relied "solely on Henson in making these investments. Their reliance was justified based on their personal friendship with Henson and the fiduciary role he accepted."

Rather than receive any return after the first year, the investors were informed Boston's practices had caused the loss of "a substantial portion of their investment." No guaranty was forthcoming from Henson at that time but "he was withdrawing their funds and transferring them to a Dallas commodities broker who would recover their original investment plus their guaranteed amount within a relatively short period of time."

The court found "Henson was improperly intermingling his investors' funds with his own and with those of the other investors in the Boston Trading Group Accounts." The interests of the investors were found to be securities (Corp. Code, § 25019), Henson was an "issuer," and he had not qualified nor exempted himself from qualifying the securities. (Corp. Code, § 25110.) "He also offered and sold securities through misrepresentations and omissions—including the guaranteed nature of the investments, that the commodities were safe and involved no risk, that he was personally knowledgeable and sophisticated in commodities trading, that he had sufficient personal assets to cover any losses the investors might suffer, and that their accounts would be professionally monitored and managed—all in violation of Corporations Code § 25401."[2]

Other than a partial return of funds to a select few, the investors received nothing, but were convinced by Henson "to leave their remaining funds in

---

[2] The court listed the commodities groups and the individual investments as follows:

| Group #9 | | |
|---|---|---|
| Wolfes | $ 7,500 | 6/30/81 |
| Group #15 | | |
| Stokes | 15,750 | 9/1/80 |
| Madalas | 15,750 | 9/1/80 |
| Hall | 2,625 | 8/19/80 |
| Rizzo | 27,650 | 9/1/80 |
| Group #19 | | |
| Pashley | 13,650 | 11/4/80 |
| Heald | 25,200 | 11/1/80 |

his control with the promise that he would recover their original investment plus much more by investing their funds in a gold mine in Chloride, Arizona." Additional investors were recruited, notably not including Henson himself who "obtained a nine percent interest in the gold mine. The Plaintiffs put up all funds to be used for development of the mine but only obtained a three and one-half percent interest initially. The remaining eighty-seven percent interest was owned by various third parties. . . . He used the investors' funds to purchase additional interests in the mine [and each time] allocated himself an additional personal ownership interest while putting up no personal funds."

The investors were told they had no obligation beyond their initial investment and tax returns Henson provided indicated they were limited partners. The entities were, however, structured as joint ventures, a term neither understood by nor explained to the investors. At the time he solicited the funds for the gold mine, Henson told the investors the mine would be profitable but he then knew "the project might be seriously undercapitalized." He "failed to disclose that information to Plaintiffs." "The investors were told by Henson that the mine would go into production two to three months after their investment, that is, in June or July of 1982." There was never any production. And, except as noted in the award, no funds were returned to the investors "despite requests in writing and in person and despite constant and repeated promises that their funds would be returned to them."

The court found the gold mine interests were securities and "Henson failed to qualify or obtain an exemption for the gold mine securities, operated as a broker-dealer without a license and sold the securities through omissions and misrepresentations" which directly caused the plaintiffs' losses. The purchases were rescinded, with damages awarded in the amount of each investment less any repayment received.[3]

---

[3] The "rolled over" and additional investments were listed by the court as follows:

| | | |
|---|---|---|
| Wolfe | Rollover | 4/13/82 |
| Stokes | Rollover | 4/13/82 |
| Madala | Rollover | 4/13/82 |
| Rizzo | Rollover | 4/13/82 |
| Pashley | Rollover | 4/13/82 |
| Heald | Rollover | 4/13/82 |
| Hall | Rollover | 4/13/82 |
| | $ 4,200 | 4/13/82 |
| | 1,250 | 6/25/82 |
| | 834 | 3/2/83 |
| | 4,500 | 7/9/83 |
| Kain | 8,000 | 4/13/82 |
| | 2,000 | 6/27/82 |
| | 1,200 | 3/16/83 |

(Fn. 3 continued on p. 192.)

Henson assumed a fiduciary position in relation to the investors as "investment adviser, trustee of the commodities accounts, managing partner of the gold mine venture, and securities broker-dealer." Although not initially intending to defraud, "he breached his duty as a fiduciary by failing to make the fullest disclosure of all material facts concerning the transactions that might have affected Plaintiffs' investment decisions. The [p]laintiffs' losses were caused by and have resulted directly from the actions, misrepresentations and omissions of Henson." They were awarded damages "in the same amount as the rescission damages . . . [as] an alternative basis for recovery . . . ." The court determined Henson's breach of fiduciary duty constituted fraud and added punitive damages. The total judgment against Henson was $244,793.47.

Henson contends the statutory actions were barred by the applicable statute of limitations; thus, the plaintiffs had no right to rescission and damages. He further argues there is insufficient evidence to support the court's finding he breached a fiduciary duty. The finding of constructive fraud, he claims, was improper because there was no such allegation in the complaint and the evidence was insufficient to support the holding in any event. Henson also objects to the damages awarded.

## II

■ At the outset, we note the majority of Henson's brief consists of a challenge to the sufficiency of the evidence to support the trial court's findings. However, " 'our power begins and ends with a determination as to whether there is *any* substantial evidence to support them; . . . we have no power to judge of the effect or value of the evidence, to weigh the evidence, to consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom. [Citations.]" (*Leff* v. *Gunter* (1983) 33 Cal.3d 508, 518 [189 Cal.Rptr. 377, 658 P.2d 740].) We must consider the evidence in the light most favorable to the plaintiffs, *despite* the presence of any conflict. (*Ibid.*)

(Fn. 3, continued)

| | | |
|---|---|---|
| Michelon | 2,000 | 4/13/82 |
| | 1,500 | 6/27/82 |
| | 420 | 4/7/83 |
| Hale | 5,000 | 4/18/82 |
| | 15,000 | 7/2/82 |
| | 493 | 7/6/83 |
| | 394 | 7/22/83 |

## III

The court found Henson "violated the California Corporate Securities Law." Henson contends any statutory action is barred by the time limitations contained in the statutes, which "are *conditions* on the substantive rights granted to plaintiffs."[4] He relies on 3 Witkin, California Procedure (3d ed. 1985) Actions, section 315, pages 345-346: "The defense of the statute of limitations must be specially pleaded or otherwise appropriately raised by the defendant; but where a substantive time limit is involved the plaintiff must allege facts which show that the right has not expired."

First, there is no mention of the limitations issue in Henson's answer to the complaint (which alleged discovery of the right to bring suit was made only a few months before the complaint was filed in October 1984), there was no demurrer to the complaint on this basis, and the issue was not raised by trial brief, at trial, or during final argument.[5]

Second, we are treated to Henson's version of the testimony to substantiate his claim the plaintiffs knew of any securities violation over one year before filing the complaint. However, this is a question of fact for the court, which found adversely to Henson.

## IV

Even were Henson's statute of limitations contention properly raised, the court made an alternate finding based on his breach of fiduciary duty, which alone would support the award of damages. The court stated: "Defendant Henson acted as a fiduciary in his relationship with each of the plaintiffs and, as such, his actions and his dealings with each of the plaintiffs constituted constructive fraud."

---

[4] Henson does not challenge the findings (1) the commodities and the gold mine venture were in fact securities requiring qualification and registration with the State of California, and (2) he did not comply with the necessary requirements. He testified he had no securities license and had not qualified or registered the offerings.

[5] Henson argues the appropriate statute is Corporations Code section 25507, allowing only two years from the sale in which to bring suit. Thus, he contends, the complaint itself shows the alleged omission occurred beyond the statute, thereby absolutely barring suit. He misreads the court's statement of decision and judgment. Henson was found in violation of both Corporations Code sections 25110 (failure to qualify securities) and 25401 (sale by omission of material information). For violation of section 25110, rescission damages are allowed under section 25503, which carries a two-year statute of limitations (§ 25507). However, for a violation of section 25401, rescission occurs pursuant to section 25501, governed by a *four-year* statute of limitations (§ 25506).

The judgment reiterates both violations but ties the grant of rescission merely to section 25503. There is no mention of *either* statute of limitations because, as the court noted, it was never raised as an issue.

In attacking this portion of the decision, Henson first contends the complaint alleged the fiduciary relationship arose from his position as "a CPA and tax preparer" while the court stated the relationship arose from Henson's "roles as investment advisor, trustee of the commodities accounts, managing partner of the gold mine venture, and securities broker-dealer . . . ."[6] He now claims the *alleged* relationships remained unproven. He is wrong. By his own testimony, he admitted he handled tax matters for several of the plaintiffs prior to the subject investments. Assuredly, he did so during the gold mine venture. A fiduciary relationship was alleged, the court found one to exist, and there is ample evidence to support the finding.

Henson flatly states there is little or no evidence of each plaintiff's relationship with him and, if fiduciary in nature, how he breached that trust. He bases this mainly on the failure of each plaintiff to testify personally. However, he has again failed to cite any sections of the record or offer any authorities to support his position. ■ We are not "required to consider alleged error where the appellant merely complains of it without pertinent argument . . . [and] may treat it as abandoned . . . ." (*Rossiter* v. *Benoit* (1979) 88 Cal.App.3d 706, 710-711 [152 Cal.Rptr. 65].) ■ Nonetheless, our review of the record indicates the evidence is sufficient on this issue.

Three of the plaintiffs testified they were personally inexperienced in investing, were approached by Henson, and invested based solely on his alleged experience and success in the field. Henson, who represented himself at trial, asked questions which elicited this very information.[7] His minister, Stokes, testified, "I went into it expressing to Ken that I was depending on his financial knowledge and his history of dealing with investments, because I had no knowledge. In a sense, I had gotten involved in the first one with him there somewhat as a protector and that was continuing on as our relationship."

To the Wolfes, Henson even suggested taking out a second mortgage on their home, which they did because they "trusted him," a man they met through church activities. In answer to a question by Henson, Wolfe replied, "I trusted you completely." Most important, Henson himself testified

---

[6] Henson conveniently omits the following language of the complaint: "HENSON assumed a fiduciary relationship with Plaintiffs and had a responsibility to fully disclose all information concerning the mining property to Plaintiffs in a full and truthful manner."

[7] As an example, Henson asked Bruce Stokes, "What was the ultimate decision that made you get involved with investing in the commodities, Mr. Stokes?" Stokes replied, "Your personal guarantee."

as to how he met all the named plaintiffs, and presented the "investment" opportunities to them. Documentary evidence corroborates the finding the investors were highly dependent upon Henson's expertise.

As to the breach of his fiduciary duty, there is considerable evidence of his failure to apprise the plaintiffs of the risks involved in his proposed ventures. And, in fact, by his own testimony, he was aware of the need for capital far in excess of that raised by him through the mine investors in order to begin production. This serious factor was not relayed to the investors. Rather, Mr. Kain was told they "would get [their] money out of there in two months or six weeks or something." Henson said "everything was going fine and that the mine would be in production almost immediately." He continued to paint a rosy picture, despite the problems apparent from the beginning. In one early letter to the investors, he stated, "Also, since a majority of you are not sophisticated investors, it is very difficult for you to comprehend highly technical financial investments." Still there was no full disclosure of the risks involved in any of the ventures.

Henson complains, again, because only three of the plaintiffs testified. However, it is his own testimony which corroborates the contentions of all plaintiffs. He recognized such investors as "the Stokeses, the Wolfes, the Healds, the Madalas . . . as unsophisticated." He told *all* investors there was "the possibility of becoming as financially independent as you want" and that he "had spent years and thousands of dollars acquiring financial information . . . ."[8] Henson made no effort to call any of the nontestifying plaintiffs; he attempted, during closing argument, to characterize their absence at the trial as proof of their "sophistication." Not so, said the court. There was no such evidence at trial and Henson had the opportunity to call those witnesses had he chosen to do so, in the belief they could countermand the plaintiffs' evidence. The court went so far as to suggest the proper action might be a motion to reopen. Henson declined.[9]

Our review of the evidence indicates there is sufficient evidence of the existence of a fiduciary duty between Henson and the plaintiffs. His continuing omission of relevant information during discussion with them, and most particularly in correspondence with them, was a breach of the duty of

---

[8] By letter to the commodities investors, Henson made clear his understanding of their position: "The worst thing I have to deal with is the only reason why many of you got into commodities was because I told you it was the right thing to do and I personally guaranteed it."

[9] We note the court was extremely solicitous of a propria persona defendant. However, we decline to address Henson's contentions he should be given greater latitude, even on appeal, because of that position. Henson represented himself at trial, obtaining counsel only after the decision was announced. Counsel remained of record until the appellate briefs were filed, at which time Henson again substituted himself in as an in propria persona appellant.

good faith he owed. This indicates at best a reckless disregard of the interests of the investors. He commingled his funds with theirs during the commodities investment period, repaid at least one investor without replenishing the loss himself, and failed to apprise anyone of the miserably inadequate capitalization of the mine venture.[10] In particular, he knew there were those who could ill afford such a wild risk. There are other instances in the record; we do not recite them all. Suffice it to say, there is evidentiary support for the court's decision.[11]

V

Henson alleges there was no cause of action pleaded for constructive fraud. He contends the complaint "sets forth causes of action for securities fraud and intentional fraud" only and he had no chance to defend himself against the constructive fraud claim.

There is no citation to authority for his position; the issue was clearly raised by the plaintiffs' trial brief, to which Henson made no objection; and the fact that he is in propria persona is an insufficient reason for reversing on this point. Moreover, the evidence of constructive fraud was much the same as that presented on the actual fraud count. There were no objections to the trial brief or to any evidence on this issue. (See *Cooper* v. *Weatherholt* (1938) 28 Cal.App.2d 321, 324 [82 P.2d 524].) ■ "The virtually unanimous rule in California is that variance between pleading and proof does not constitute error where no prejudice is shown and no objection to evidence or motion for nonsuit had been made in the trial court. [Citations.]" (*Quezada* v. *Hart* (1977) 67 Cal.App.3d 754, 761 [136 Cal.Rptr. 815].) We find no error.

---

[10] Although we do not address the issue, his accounting methods were creative at best. While promising the investors a 25 percent return on their investment, whether or not the commodity venture proved successful, no return appeared on any announcement to the investors. Henson attempted to explain this anomaly to no avail. *And* when one investor took her amount out of the commodity pool, a check was written by Henson on the pooled account, but no funds reentered the account from him, as promised. Rather, he states it was merely a "papered" transaction. Yet, the investors' individual amounts left in the account decreased, and there is no accounting of Henson's share.

[11] Henson also states damages were awarded pursuant to violation of the securities laws; the plaintiffs were not entitled to these damages; and, because damages for breach of his fiduciary duty were "in the same amount as the rescission damages," zero equals zero. We cannot agree. Whether the plaintiffs *recovered* damages pursuant to the securities violation is immaterial—it was the amount *awarded* which was to coincide with the amount to which the plaintiffs were entitled for the fiduciary breaches. As noted by the trial court, "This is an alternative basis for recovery and only one award of compensatory damages is being made."

## VI

■ Henson further contends there is insufficient evidence to support the finding of constructive fraud. He cites *Younan* v. *Equifax Inc.* (1980) 111 Cal.App.3d 498, 516, footnote 14 [169 Cal.Rptr. 478]: "The elements for the cause of action for constructive fraud are: (1) fiduciary relationship; (2) nondisclosure (breach of fiduciary duty); (3) intent to deceive, and (4) reliance and resulting injury (causation)."

We need not again list the evidentiary factors to support the existence of a fiduciary duty and the breach thereof by failure to disclose material facts to the investors. The lack of sophistication of the investors in general supports their reliance. Henson's main argument is his perceived lack of any evidence of "intent to deceive." He notes the court's statement, "Henson did not set out purposely to defraud plaintiffs, nor did he improperly divert their funds to his own purposes." However, while the court did not find any *intentional fraud* at the inception of the venture, it mentioned, during trial and argument, Henson's continuing failure to report material matters to the investors. He clearly found Henson intended the results of this failure to inform, namely the continuing investment by the plaintiffs in a venture with little to recommend it. Merely because Henson had no intent to *defraud,* i.e., to take their funds for his personal use, is not to say there was no intent to *deceive.* The latter intent is implied from his continuing failure to relay to the investors the highly significant risks being taken with their cash, risks he was himself aware of while "monitoring" their investments.

"The fraud consists of the breach of the *fiduciary duty* of disclosure of relevant matters arising from the relationship." (*Younan* v. *Equifax Inc.,* *supra,* 111 Cal.App.3d 498, 517.) Henson does not question the causation factor. We find sufficient evidence in the record to support the court's finding.

## VII

The court awarded punitive damages of 25 percent of the principal amount invested by each plaintiff (notably the amount promised to them as return on their investments). Henson's first objection to this award is a reiteration of his insistence rescission damages are barred and there are, therefore, no compensatory damages available. We rejected this assertion, *ante.* (See fn. 11.) He next claims no damages were awarded for constructive fraud; thus, punitive damages cannot be awarded "in addition to the actual damages . . . ." (Civ. Code, § 3294.) However, we note the court specifically stated in its statement of decision that Henson's breach of "his

fiduciary duty *constitutes* constructive fraud warranting additional damages by way of punishment and example." (Italics added.) The court could properly award punitive damages for the constructive fraud.

## VIII

Last, Henson takes exception to the individual damage awards, claiming the evidence was insufficient as to each separate plaintiff. Again, we remind Henson we *must* uphold the judgment if there is *any* substantial evidence to support the court's findings. His version of the testimony is colorful, but it omits the portions adverse to him as well as the sections which are in conflict. As to the latter, it is the province of the trier of fact to choose between conflicting views. We do not reweigh those facts. And we cannot even consider the credibility of the witnesses, despite Henson's characterizations. Most important, there is no citation to the lengthy reporter's transcript for many of the statements he insists were made by the various witnesses. We need not search for those citations. And it is no excuse that Henson is in propria persona "[H]e is entitled to the same, but no greater, consideration than other litigants and attorneys [citations]." *Nelson* v. *Gaunt* (1981) 125 Cal.App.3d 623, 638 [178 Cal.Rptr. 167].)

Nonetheless, the record has been examined and, as discussed earlier in this opinion, there is sufficient evidence to support the court's findings of breach of fiduciary duty and constructive fraud. The damages were based on each plaintiff's individual investment, and were corroborated by charts in evidence. Henson did not object to those records, and, in fact, he stipulated to the entry in evidence of the majority of them.

Moreover, Henson's objection to the individual damage amounts awarded rests not upon any disagreement with the claimed amounts but upon his perceived lack of any right to statutory damages or of any proven fiduciary relationship. These issues have been covered; we need not repeat the findings or the evidence supporting them.

## IX

There is a discrepancy between the statement of decision and the judgment. In its statement of decision, the court correctly listed among the plaintiffs "Frank Hale, Jr. (Shirley Hale having been dropped as a Plaintiff) . . . ." In the judgment filed March 11, 1989, Frank Hale, Jr., received an award. However, in the amended judgment filed April 29, 1988, the corresponding award was made to "Frank Hale, Jr. and Shirley Hale." This

clerical error is easily remedied by striking "and Shirley Hale" from paragraph 14, page 7, of the amended judgment.

As modified in part IX, the judgment is affirmed. Respondents to receive costs.

Scoville, P. J., and Wallin, J., concurred.