97 F.3d 1171
 96 Cal. Daily Op. Serv. 7123, 96 Daily Journal
D.A.R. 11,695
In re DAISY SYSTEMS CORPORATION and Daisy/Cadnetix, Inc.
BEAR STEARNS AND COMPANY, INC., a Delaware corporation;
Bruce M. Holland; Burton J. McMurtry; Carl D.
Carman; F. Gibson Meyers; Lutz P.
Henckels, Creditors-Appellees,
v.
DAISY SYSTEMS CORP., Debtor,
and
Jack S. Kenney, in his capacity as Chapter 11 Trustee for
Daisy Systems Corporation and Daisy/Cadnetix,
Inc., Trustee-Appellant.
 No. 95-15267.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 8, 1996.
Decided Sept. 24, 1996.
 
 Ronald Lovitt, J. Thomas Hannan, Lovitt & Hannan, Inc., San Francisco, California; Andrew D. Hurwitz, Robert L. Palmer, Osborn Maledon, Phoenix, Arizona; James C. Nielsen (argued and on the brief), Peter Mallon, Wright, Robinson, McCammon, Osthimer & Tatum, San Francisco, California; John J. Bartko, Christopher J. Hunt, Bartko, Zankel, Tarrant & Miller, San Francisco, California, for the trustee-appellant.
 Robert E. Cooper (argued), Robert Forgnone, Daniel S. Floyed, Ginger G. Bauer, Gibson, Dunn & Crutcher, Los Angeles, California, for creditors-appellees Bear Stearns.
 Appeal from the United States District Court for the Northern District of California, D. Lowell Jensen, District Judge, Presiding. D.C. No. CV-92-01845-DLJ.
 Before: FERGUSON, D.W. NELSON and FERNANDEZ, Circuit Judges.
 D.W. NELSON, Circuit Judge:
 
 
 1
 Appellant Jack Kenney, Chapter 11 Trustee for Daisy Systems Corporation and Daisy/Cadnetix, Inc. ("Daisy"), appeals the district court's grant of summary judgment for Appellee Bear Stearns & Co., Inc. ("Bear Stearns" or "the investment bank"), in Kenney's action for professional negligence and negligent misrepresentation. Kenney also appeals the district court's denial of his request for leave to amend his complaint to state a claim for breach of fiduciary duty. We affirm in part, reverse in part and remand.
 
 FACTUAL AND PROCEDURAL BACKGROUND
 
 2
 In 1988, Daisy, a public corporation specializing in the development of computer-aided engineering systems, sought to acquire Cadnetix, a public company that developed computer-aided and manufacturing design systems. Daisy's president and Chief Executive Officer, Dr. Norman Friedmann, approached Michael Tennenbaum, a senior managing director at Bear Stearns, for his assistance in the acquisition. Friedmann, who had never before been involved in the acquisition of a public company, reportedly asked Tennenbaum if Bear Stearns could analyze the Daisy/Cadnetix merger and the benefits the deal would confer upon Daisy shareholders. Tennenbaum maintained that the investment bank had adequate resources to analyze the transaction, and told Friedmann that Bear Stearns would charge Daisy $75,000 for the bank's services.
 
 
 3
 On May 5, 1988, Bear Stearns sent Daisy a letter outlining the terms of its retention; in it, Bear Stearns agreed to "assist [Daisy] as its exclusive financial advisor in connection with any Transaction with Cadnetix Corporation."[1] Bear Stearns' services were to "include advice on valuation and structuring of the Transaction, and assisting [Daisy] in negotiations with Cadnetix." Daisy was obliged by the agreement to provide Bear Stearns with any information regarding either Daisy or Cadnetix that Bear Stearns "deem[ed] appropriate." The letter further stated that the bank would be using and relying upon this information "without independent verification ... by Bear Stearns," and that it was to assume no responsibility for the accuracy and completeness of any information provided by Daisy regarding Cadnetix. In addition to the $75,000 fee to which Bear Stearns was entitled, Daisy was to pay Bear Stearns 1% of the fair market value of the total consideration received by Cadnetix if the merger was consummated successfully.
 
 
 4
 Cadnetix, however, rejected Daisy's attempts to effect a friendly merger; consequently, Tennenbaum told Friedmann that Daisy should consider a hostile acquisition, and that it should "create[ ] more pressure" on Cadnetix by acquiring shares of the company.
 
 
 5
 On September 19, 1988, Tennenbaum advised the Daisy Board of Directors of Bear Stearns' analysis of the proposed acquisition of Cadnetix; this analysis included a discussion of acquisition strategies, price ranges for the acquisition, feasibility, financial analysis, and the availability of financing. At this meeting, the Daisy Board voted to engage in a hostile tender offer for Cadnetix. Friedmann stated that Tennenbaum told him that if Daisy could not otherwise fund the transaction, Bear Stearns would provide funding.
 
 
 6
 By letter dated September 22, 1988, Bear Stearns and Daisy amended the terms of Bear Stearns' retention; while this letter contained substantially the same provisions as those in the May 5 agreement, it further provided that "Bear Stearns will act as dealer manager in any tender offer or exchange offer for securities of Cadnetix ... and, subsequent to the approval of Bear Stearns' Commitment Committee,[2] will assist the Company in obtaining financing, if so required." (emphasis added) Daisy was to pay Bear Stearns a fee of $250,000 "[e]ither for acting as Dealer/Manager ... or upon any public report associating Bear Stearns with a hostile takeover of Cadnetix by Daisy," and was to give Bear Stearns the opportunity to be the "sole managing underwriter or exclusive agent" if Daisy chose to retain an investment banker or financial advisor for assistance in obtaining financing. The letter also stated that if Bear Stearns were to issue to Daisy any letters stating that the investment bank was "highly confident" that it could arrange the financing for the deal, Daisy would pay Bear Stearns 3/8% of the principal amount of the financing referred to in the letter, subject to a $100,000 minimum.
 
 
 7
 On September 30, 1988, Daisy announced its offer to purchase 51% of Cadnetix's shares at $8.00 per share; the offer was conditioned on Daisy's being able to obtain "sufficient financing on terms acceptable to [Daisy]." Bear Stearns then issued a letter stating that it was "highly confident" that $50 million of financing could be secured "under current market conditions." On October 12, 1988, the Cadnetix Board rejected the Daisy offer as inadequate. On October 17, 1988, Daisy offered $8.00 per share for 100% of Cadnetix stock; Bear Stearns issued yet another letter, stating that it was "highly confident" that $100 million of financing could be secured "under current market conditions." On October 24, 1988, Daisy raised its offer to $8.375 per share.
 
 
 8
 On October 31, 1988, Tennenbaum met with representatives of Daisy and Cadnetix and informed them that Bear Stearns intended to finance the transaction even if it was hostile. On November 6, however, Tennenbaum told the Commitment Committee that efforts to finance the transaction had been unsuccessful "due to the hostile nature of the transaction, the current turnaround of Daisy and general unwillingness to lend to high technology companies. Few banks actually reached the credit analysis stage."
 
 
 9
 Bear Stearns argues that on November 10, it committed to loan Daisy $130 million in connection with the October 24 offer. Kenney contends, however, that Tennenbaum's offer to loan Daisy $130 million, a commitment for which Daisy paid $975,000, was not limited to the October 24 offer. Cadnetix subsequently agreed to a friendly merger, and on November 10, an agreement between the companies was reached. Pursuant to the agreement, Daisy was to acquire Cadnetix in a one-step merger for $9.50 per share, payable with $6.50 in cash and $3.00 in debentures convertible into Daisy common stock. Bear Stearns contends that it was to be involved only in "giving 'advice on the terms of the debentures,' specifically the price and timing of the conversion features."
 
 
 10
 The companies later amended the details of their agreement to provide for a two-step merger. In the first stage, Daisy was to purchase 50.1% of Cadnetix's shares at $9.50 cash per share, and in the second, the remaining Cadnetix shares would be acquired for $3.78 cash per share and convertible Daisy debentures. The merger was to become effective on November 23, 1988, and the second stage was to be completed within 6 months of the acquisition. Bear Stearns contends that it was not asked to prepare a report or opinion on any part of the transaction.
 
 
 11
 Bear Stearns also argues that Daisy did not ask it for assistance in financing the second step of the merger. The bank maintains that one of Daisy's SEC filings made pursuant to the offer, in which Daisy states that the "management of Daisy presently intends to arrange at least $50 million of bank indebtedness which will be a liability, and possibly secured by the assets of New Daisy," lends support to the bank's contention that Daisy intended to finance the deal independently. Nonetheless, Bear Stearns contends that "on the chance that it would be asked to seek financing," it informed Daisy in early December 1988 that Daisy would need to submit detailed financial projections regarding the future prospects of the business in order to secure financing; it also "informed Daisy that it was imperative that Bear Stearns begin to search for financing as soon as possible."
 
 
 12
 Kenney contends that when Tennenbaum learned that Daisy was making its own attempts to secure financing, he discontinued Bear Stearns' efforts to obtain financing for the deal. Indeed, Tennenbaum stated that he told the Commitment Committee that "[Daisy] had misled us for several months and had by themselves been seeking the financing in order not to pay us a fee." Kenney maintains, however, that Daisy did not know that Bear Stearns was not actively seeking financing until its Chief Financial Officer contacted Tennenbaum and was told no more work would be done until another engagement letter was executed. Daisy's counsel informed Friedmann that Bear Stearns' merger success fee suggested that Bear Stearns was to continue its financing efforts; moreover, in an internal memo dated November 28, 1988, Bear Stearns confirmed its intention of arranging for financing for the second step in the acquisition. Nevertheless, Daisy and Bear Stearns executed yet another engagement letter in which the parties agreed to amend the terms of the September 22 agreement, and to provide for Bear Stearns' retention as "exclusive agent in connection with raising all financing necessary."
 
 
 13
 Bear Stearns contends that on April 18, 1989, it committed to contribute $15 million to a financing package for Daisy; the record indicates, however, that 2 days later, on April 20, 1989, the Bear Stearns Commitment Committee approved a $45 million bridge loan[3] to Daisy. Tennenbaum told Daisy that the Committee had rejected the bridge loan proposal; at the same time, he informed Daisy that Heller Financial, Inc., would be willing to finance the second step of the transaction. Heller representatives stated that the pricing proposed by Bear Stearns on the Daisy loan "far exceeded what we would normally receive in any other type of transaction."
 
 
 14
 Kenney maintains that the lack of publicly disclosed financing caused Daisy's major customers to defer their orders, and that at the same time, competitors were attempting to lure key employees away from the company. Consequently, Kenney argues, Daisy failed to meet its sales projections and was unable to refinance the company. The company's condition continued to decline, and its creditors eventually placed it into involuntary bankruptcy. Kenney then was named as the company's Chapter 11 trustee.
 
 
 15
 On May 30, 1991, Kenney filed this lawsuit in the Bankruptcy Court. On March 20, 1992, he filed a First Amended Complaint, and the matter was then referred to the District Court. On July 24, 1992, he filed a Second Amended Complaint. On February 3, 1993, the District Court granted Bear Stearns' motion to dismiss portions of Kenney's complaint, including its first claim for breach of fiduciary duty. On February 9, 1994, Bear Stearns moved for summary judgment. The district court granted Bear Stearns' motion on August 12, 1994, and denied Kenney's motion for a rehearing. Kenney now appeals.
 
 STANDARD OF REVIEW
 
 16
 A grant of summary judgment is reviewed de novo. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir.1995). The appellate court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. Id.
 
 
 17
 Leave to amend is generally within the discretion of the district court. Rhoden v. United States, 55 F.3d 428, 432 (9th Cir.1995). The district court's denial of a motion to amend a complaint is reviewed for an abuse of discretion. United States v. County of San Diego, 53 F.3d 965, 969 n. 6 (9th Cir.1995).
 
 DISCUSSION
 I. Professional Negligence
 A. Bear Stearns' Duty to Daisy
 
 18
 In order to establish a claim for professional negligence, a plaintiff must demonstrate: 1) the duty of the professional to use such skill, prudence and diligence as other members of his profession commonly possess and exercise; 2) a breach of that duty; 3) a proximate causal connection between the negligent conduct and the resulting injury; and 4) actual loss or damage resulting from the professional's negligence. Jackson v. Johnson, 5 Cal.App.4th 1350, 1355, 7 Cal.Rptr.2d 482 (1992).
 
 
 19
 Kenney argues that as Daisy's "exclusive financial advisor," Bear Stearns was obliged to assume a broad range of duties. The contours of these duties, Kenney maintains, can be determined by expert testimony. See, e.g., Selden v. Dinner, 17 Cal.App.4th 166, 21 Cal.Rptr.2d 153, 158 (1993)(holding that professional negligence claim against physician was barred where plaintiff failed to present expert testimony establishing the duty of care). Accordingly, Kenney's expert stated that as Daisy's "exclusive financial advisor," Bear Stearns should have assessed the risks and benefits of alternative structures for the transaction and the probable impact of the transaction on the market for the companies' stock, analyzed the effects of the transaction on Daisy and Cadnetix's business operations, determined financing alternatives and sources, analyzed operational impacts, and provided the necessary expertise to assess the feasibility of alternatives. That Bear Stearns failed to discharge these duties is, according to Kenney, indicated by its negligent advice to embark upon a hostile tender offer. Indeed, there were statements that hostile mergers are ill-advised in the high-tech industry, and even Tennenbaum admitted that financing the Daisy/Cadnetix deal was difficult due to the "hostile nature of the transaction" and the "general unwillingness to lend to high technology companies."
 
 
 20
 Relying upon a set of cases addressing the role of expert testimony, however, Bear Stearns contends that its duties are circumscribed far more narrowly than Kenney's expert suggests. See Monroe v. Hughes, 31 F.3d 772, 775 (9th Cir.1994); In re Apple Computer Securities Litigation, 886 F.2d 1109, 1116 (9th Cir.1989), cert. denied, 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990). The investment bank argues that the Daisy/Bear Stearns engagement letters establish the limits of Bear Stearns' duties to Daisy, and that the bank's primary function was to advise on valuation and structuring and assist in negotiations. Bear Stearns further argues that Kenney's vision of duty is expressly disclaimed by the terms of the engagement letters, which provide that Bear Stearns is not responsible for the accuracy of any of the information provided by Daisy; in addition, the bank maintains that in the absence of any evidence that Daisy in fact relied on trade custom, any evidence of that custom as to the appropriate professional duties cannot be used to contradict the express terms of the letter.
 
 
 21
 However, Bear Stearns' analysis misconstrues the terms of the engagement letters. While the investment bank argues that the engagement letters establish the outer boundaries of the professional duties owed Daisy, an examination of those letters demonstrates that Bear Stearns' argument overstates the reach of those agreements. The letters merely provide that Bear Stearns' assistance will "include advice on valuation and structuring"; they do not state that Bear Stearns' involvement in the transaction will be limited to those activities.
 
 
 22
 Moreover, the cases upon which Bear Stearns relies are inapposite. In Monroe, the expert testimony at issue was inconsistent with prevailing professional standards, while in Apple, the court held that no deference was due to the expert's testimony where that testimony conflicted with the clear evidence in that case. In this case, however, there is no tension between the expert testimony and any generally accepted professional standards, nor does that testimony contradict the evidence regarding the nature of the duties owed. Thus, given our "general rule [that] summary judgment is inappropriate where an expert's testimony supports the nonmoving party's case," Apple, 886 F.2d at 1116; Bieghler v. Kleppe, 633 F.2d 531, 534 (9th Cir.1980), the testimony offered by Kenney's expert suggests that summary judgment was inappropriately granted.
 
 
 23
 The bank's contention that Daisy did not rely on the broad set of duties that Kenney now claims Bear Stearns should have assumed is also without support; the record demonstrates that Friedmann, Daisy's CEO, had no experience in acquiring public companies, and that he may have relied on Tennenbaum to provide him with assistance on a broad range of issues.
 
 
 24
 Thus, as Daisy's expert testimony established the appropriate duty of care in the investment banking community, and that interpretation of professional duty was not inconsistent with the express terms of any written agreements between Daisy and Bear Stearns, we accept that view of professional duty, and now look to whether there is any evidence that it was breached.
 
 B. Breach of Duty and Harm to Daisy
 
 25
 We have little difficulty concluding that genuine questions of fact exist as to whether any duty Bear Stearns owed Daisy was breached. While Bear Stearns relies on the fact that the engagement letters provided that the investment bank would not be held responsible for the accuracy of information, the letters absolved the bank of responsibility only with respect to the accuracy of information provided by Daisy. What is being challenged here, however, is the diligence of Bear Stearns' analysis. It is worth noting that Bear Stearns does not appear to argue that it conducted anything but a post-hoc analysis of the possibility of financing a hostile Daisy/Cadnetix deal; indeed, on November 6, several weeks after the "highly confident" letters had been issued, Tennenbaum told the Bear Stearns Commitment Committee that banks were generally unwilling to lend to high technology companies.
 
 
 26
 However, Bear Stearns denies any connection between the advice it gave Daisy and the injury Daisy suffered. It argues that its analysis and assurances to Daisy were made solely with respect to a hostile transaction, and that its advice was ultimately successful in that a friendly merger eventually was executed. Its position thus may be reduced to the proposition that even if it did owe the duties that Kenney maintains were owed, and even if it breached those duties, that breach resulted in no harm to Daisy, as it was the friendly agreement, about which it was not consulted, and Daisy's operation of the business, that caused Daisy's bankruptcy.
 
 
 27
 This argument, however, fails to address adequately the heart of Daisy's claim. Daisy contends that it was Bear Stearns' advice to adopt a hostile strategy that resulted in harm to the company. Indeed, it was in reliance upon this advice that Daisy began to acquire significant shares of Cadnetix stock, thus committing its resources to a transaction that might not have been executed in the absence of Bear Stearns' advice. Daisy presented evidence that this "toehold" strategy was thought by some in the industry to be exceedingly unwise and risky.
 
 
 28
 There may exist some question, however, as to whether there was any connection between these stock purchases and Daisy's eventual bankruptcy. Daisy claims that the acquisition of Cadnetix stock so deeply committed Daisy to the merger that it was impossible for Daisy to abandon the deal, and that it was effectively forced to accept the Heller terms because "a default on the Cadnetix merger would 'result in significant damage to Daisy and Cadnetix' threatening the 'ongoing viability of the companies.' "
 
 
 29
 Assuming that Daisy's stock acquisitions did have this effect, one must posit some connection between the Heller loan terms, Daisy's inability to refinance, and the eventual bankruptcy. In order to recover, Daisy would thus have to demonstrate that Bear Stearns' advice, which put the company in a position where it was dependent upon financing that was either impossible to obtain or available only on exorbitant terms, was a "substantial factor" in its bankruptcy; in order to do so, it would have to demonstrate that other, perhaps internal, concerns did not lead to its downfall. See Williams v. Wraxall, 33 Cal.App.4th 120, 39 Cal.Rptr.2d 658, 665 (1995)(holding that in an action for negligence, element of causation demands proof that the negligence complained of was a "substantial factor" in bringing about harm, and that the harm was "more likely than not caused by [the] wrongful act or omission").
 
 
 30
 Our purpose here, however, is not to outline for Daisy a possible litigation strategy, but only to demonstrate that there exist on the record a number of unresolved and material facts that should have precluded the granting of a summary judgment motion. The strength of Daisy's claims on this point should be tested by a trier of fact. Accordingly, we reverse the district court's grant of summary judgment on the professional negligence claim.
 
 II. Fiduciary Duty
 
 31
 A. Existence of a Fiduciary Relationship Between Bear Stearns and Daisy
 
 
 32
 In Beery v. State Bar, 43 Cal.3d 802, 239 Cal.Rptr. 121, 126-27, 739 P.2d 1289, 1294 (1987), the California Supreme Court cited Barbara A. v. John G., 145 Cal.App.3d 369, 383, 193 Cal.Rptr. 422 (1983), for the proposition that "[t]he essence of a fiduciary or confidential relationship is that the parties do not deal on equal terms, because the person in whom trust and confidence is reposed and who accepts that trust and confidence is in a superior position to exert unique influence over the dependent party." It was upon this notion of superiority that the district court relied in denying Kenney's motion to amend his complaint to restate a claim for breach of fiduciary duty. The court held that there was "nothing in the pleadings to permit the inference that Bear Stearns was in a position of superiority," but that the relationship was "one between two sophisticated business entities."
 
 
 33
 Contrary to the district court's holding, however, the parties' general degree of business sophistication is not at issue here; rather, what Kenney argues is that Daisy, whose Chief Executive Officer was unschooled in the niceties of public acquisitions, relied upon Bear Stearns to "undertake to do an analysis of [a Daisy/Cadnetix] merger." Thus, even though both parties were sophisticated corporations, the fact that Bear Stearns was retained to advise Daisy in a type of transaction with which Daisy had no experience suggests that the requisite degree of "superiority" may have existed. Moreover, to the extent that other individuals at Daisy may have had such experience, a question of fact would exist as to whether it was upon these individuals, rather than upon Bear Stearns, that Daisy relied.
 
 
 34
 Bear Stearns expands upon the district court's analysis, however, by summarily concluding that "the relationship between an investment banker and the banker's client is not a fiduciary relationship as a matter of law." We must reject this legal conclusion, as the existence of a fiduciary relation is a question of fact which properly should be resolved by looking to the particular facts and circumstances of the relationship at issue. See Kudokas v. Balkus, 26 Cal.App.3d 744, 103 Cal.Rptr. 318 (1972); Stokes v. Henson, 217 Cal.App.3d 187, 265 Cal.Rptr. 836 (1990). In Kudokas, the California Court of Appeal held that the "[e]xistence of a confidential or fiduciary relationship depends on the circumstances of each case and is a question of fact for the fact trier." 26 Cal.App.3d at 750, 103 Cal.Rptr. 318. Similarly, in Stokes the court inferred the existence of a fiduciary relationship between an investment advisor and his clients on the basis of the surrounding facts. 217 Cal.App.3d at 194, 265 Cal.Rptr. 836. Accordingly, in determining whether Bear Stearns may have owed any fiduciary obligations, the district court should have evaluated more carefully the details of the Daisy/Bear Stearns relationship.
 
 
 35
 Two important issues of fact that must be resolved before it can be determined whether a fiduciary relationship existed between Daisy and Bear Stearns are the questions of agency and confidentiality. As confidentiality is an element of a fiduciary relationship, see Beery, 239 Cal.Rptr. at 126-27, 739 P.2d at 1294, resolution of the fiduciary question in this case will turn in part on whether Daisy reposed confidences in Bear Stearns. Moreover, among the terms of Bear Stearns' retention was a provision stating that it would be acting on Daisy's behalf. Should a factfinder determine from the record that an agency relationship existed between the parties, see Michelson v. Hamada, 29 Cal.App.4th 1566, 1575-76, 36 Cal.Rptr.2d 343 (1994) (holding that "[t]he existence of an agency is a factual question within the province of the trier of fact whose determination may not be disturbed on appeal if supported by substantial evidence"), then a fiduciary relation should be presumed to exist. See Cal. Civ.Code § 2295 (defining an agent as "one who represents another ... in dealings with third parties"); Michelson, 29 Cal.App.4th at 1576, 36 Cal.Rptr.2d 343 (holding that fiduciary relationship existed between two doctors where one doctor became the agent of the other); Gerhardt v. Weiss, 247 Cal.App.2d 114, 116, 55 Cal.Rptr. 425 (1966)(holding that "an agent is a fiduciary [whose] obligation of diligent and faithful service is the same as that imposed upon a trustee"); Whittaker v. Otto, 188 Cal.App.2d 619, 624, 10 Cal.Rptr. 689 (holding that agent's relationship to his principal is essentially fiduciary in character and in dealing with his principal he is bound to principles of good faith and honesty). Moreover, at least one California court has suggested that even where the relationship between an agent and principal cannot generally be classified as fiduciary, a fiduciary obligation may exist with respect to those matters falling within the scope of the agency. See Wilson v. Houston Funeral Home, 42 Cal.App.4th 1124, 50 Cal.Rptr.2d 169, 178 (1996)(suggesting, without deciding, that while no case law holds that a mortuary owes a fiduciary duty to the family of the decedent, "as the family's agent for the fulfillment of its statutory obligations, [the mortuary] may owe the family a fiduciary duty in connection with the preparation and expeditious disposal of the decedent's remains"). Of course, every relationship between an investment advisor and client is not of a fiduciary nature, and determining when fiduciary obligations are in fact owed will depend in large part upon the particular facts involved. In this matter, the questions of agency and confidentiality are two factual questions that must be resolved before it can be established whether any fiduciary duties were owed Daisy by Bear Stearns.
 
 B. Breach of the Fiduciary Duty
 
 36
 Having established that there may have existed between the parties a fiduciary relationship, we next direct our attention to whether there are any facts in the record that would support a claim for breach of fiduciary duty. See United States ex rel. Schumer v. Hughes Aircraft Co., 63 F.3d 1512, 1527 (9th Cir.1995)(holding that futility of amendment should be considered in assessing the propriety of a motion for leave to amend). We think that there are.
 
 
 37
 Daisy points to the fact that Tennenbaum concealed the $45 million bridge loan as evidence of a breach of fiduciary duty. Bear Stearns maintains, however, that Daisy was not harmed by its refusal to authorize a loan to Daisy, because Heller Financial eventually agreed to fund the deal. Bear Stearns further argues that "there is no evidence that Tennenbaum was aware of anything other than the fact that $15 million was the amount that Bear Stearns would contribute to a financing package to close the transaction."
 
 
 38
 This contention strains credulity. As the record indicates, the Bear Stearns Commitment Committee authorized a $45 million bridge loan to Daisy two days after Bear Stearns alleges the $15 million loan was granted; Tennenbaum, however, told Daisy that no such authorization had been made. If Bear Stearns intends to stand by its contention that Tennenbaum had no knowledge of the $45 million loan, its position should be subjected to the scrutiny of the trier of fact. Moreover, to the extent that the bank argues that Daisy was not harmed by the Heller financing because Heller's terms were "similar" to those previously offered by Bear Stearns, the potential effect of each of the loan agreements on Daisy and Cadnetix is yet another factual question that should not be resolved on a summary judgment motion, and that we decline to address on appeal.
 
 
 39
 Bear Stearns also argues that its suspension of efforts to secure financing did not constitute a breach of fiduciary duty because it was under no obligation to obtain financing in the first instance. As support for this contention, Bear Stearns relies upon one of Daisy's SEC filings in which the investment bank does not appear to be mentioned. The portion of the filing cited by Bear Stearns, however, is located in a section entitled "Contacts with the Company; Background of the Offer," and merely provides that "management of Daisy presently intends to arrange at least $50 million of bank indebtedness which will be a liability, and possibly secured by the assets, of New Daisy." This statement is not necessarily inconsistent with Daisy's understanding that Bear Stearns, too, was to be involved in the financing.
 
 
 40
 Moreover, the bank's claim that it was not to be involved in financing the second step of the merger is called into question by an internal memo dated November 28, 1988, in which Bear Stearns confirmed its intention to arrange financing for the back end of the merger.[4] Additionally, Tennenbaum stated that he told the Commitment Committee "[Daisy] had misled us for several months and had by themselves been seeking the financing in order not to pay us a fee." The significance of this is underscored by certain provisions of the amended retention letter, which held that if Daisy chose to retain an investment banker to assist it in obtaining financing, Bear Stearns was to be given the opportunity to be the "sole managing underwriter or exclusive agent in connection with raising the funds." The bank would not, however, receive any fee for its financing efforts if Daisy were to obtain the financing without the assistance of a financial advisor. A reasonable factfinder certainly could conclude that Tennenbaum's statements suggest that before he knew of Daisy's efforts to finance the deal independently--which efforts, if successful, would deprive Bear Stearns of its fee--he was under the impression that Bear Stearns was to be involved in financing the transaction. While this is not the only meaning that properly could be assigned to Tennenbaum's statements, we think that both that statement and the November 28 memo cast much doubt upon Bear Stearns' contentions regarding its obligations to Daisy. Accordingly, there is evidence in the record which suggests that the bank may have had a duty to continue its financing efforts--a duty in which it appears to have been remiss.
 
 
 41
 Finally, Bear Stearns again argues that it fulfilled its duties to Daisy because its hostile strategy succeeded in forcing Cadnetix to negotiate a friendly merger. This contention evinces a misunderstanding of the duty owed in this matter, that duty being to provide Daisy with reliable information based upon diligent and thorough analysis, see Barbara A., 145 Cal.App.3d at 382, 193 Cal.Rptr. 422 (defining a fiduciary relationship between two parties as one where "one of the parties is in duty bound to act with the utmost good faith for the benefit of the other party.... Such a relation ordinarily arises where a confidence is reposed by one person in the integrity of another"). Its failure to do so resulted in Daisy making stock purchases with the intention of pursuing a transaction which Daisy contends the market would under no circumstances support.
 
 
 42
 Given the record in this matter, we cannot say that amending Kenney's complaint to state a claim for breach of fiduciary duty would have been futile. Accordingly, we reverse the district court's denial of leave to amend.
 
 III. Negligent Misrepresentation
 
 43
 To prevail on a negligent misrepresentation claim, a plaintiff must provide evidence of the following: 1) a representation as to a material fact; 2) that the representation is untrue; 3) that the defendant made the representation without a reasonable ground for believing it true; 4) an intent to induce reliance; 5) justifiable reliance by the plaintiff who does not know that the representation is false; and, 6) damage. Masters v. San Bernardino County Employees Retirement Ass'n, 32 Cal.App.4th 30, 40 n. 6, 37 Cal.Rptr.2d 860 (1995). Kenney rests his negligent misrepresentation claim against Bear Stearns on the bank's issuance of the highly confident letters and its alleged oral commitment to providing financing. For the reasons that follow, we reject those claims.
 
 A. The "Highly Confident" Letters
 
 44
 Kenney complains of Bear Stearns' ill-founded representations to Daisy--via the "highly confident" letters--that the market would support the Daisy/Cadnetix transaction; indeed, there is no indication Bear Stearns sufficiently analyzed market conditions before issuing the letters. Kenney argues that the letters were significant not because they detailed the particular terms under which a hostile acquisition could be financed, but rather because they were meant to communicate to Cadnetix Daisy's ability to consummate the deal under any circumstances, be they hostile or friendly, and to thereby force Cadnetix to negotiate.
 
 
 45
 This argument must fail. The terms of the letters make clear that the letters were expressions of confidence that financing could be obtained under certain specified conditions, and did not constitute guarantees that the deal could be financed regardless of the successive permutations it might take. Moreover, because the letters were conditioned upon "satisfaction of all the conditions set forth in the [October 17] offer to Purchase," any reliance upon them as being indicative of a general availability of financing clearly was unreasonable. See Masters, 32 Cal.App.4th at 40 n. 6, 37 Cal.Rptr.2d 860 (holding that one of the elements of a negligent misrepresentation claim is justifiable reliance by a plaintiff). While Daisy maintains that the purpose of the letters was to force Cadnetix to negotiate, and that Bear Stearns expected Daisy to rely upon its representation of market conditions, these claims cannot defeat the fact that the terms of the letters clearly are limited to the specific transactions noted therein.
 
 B. The Oral Loan Agreement
 
 46
 Kenney maintains that although Bear Stearns' commitment to loan Daisy $130 million initially was made with respect to the October 24 offer, the terms of that loan could be modified so as to provide financing for any later deals agreed upon. Kenney also introduced evidence that industry custom suggests that where an investment bank has provided temporary financing, it will usually provide the client with some form of bridge financing as well.
 
 
 47
 The investment bank maintains, however, that given the fact that loan commitments must first be approved by the Commitment Committee and are subject to the payment of a fee, any reliance Daisy had upon these alleged oral representations was unreasonable. See Kruse v. Bank of America, 202 Cal.App.3d 38, 55-56, 248 Cal.Rptr. 217 (1988)(holding that reliance that a loan would be approved based upon a failure to disclose that it might be denied was unreasonable where plaintiff knew that loans were subject to approval by the loan officer's superiors), cert. denied, 488 U.S. 1043, 109 S.Ct. 869, 870, 102 L.Ed.2d 993 (1989).
 
 
 48
 We agree. To the extent that Tennenbaum's representations merely implied the possibility of Daisy securing long-term financing,[5] such a representation, and accordingly, the terms of any implied loan agreement, were so vague as to render unjustifiable any reliance on them. There is evidence that Daisy paid $975,000 for something, but nowhere does Daisy suggest that it thought that the Commitment Committee approved the issuance to it of a long-term loan. Furthermore, any inferences drawn from Tennenbaum's oral representations do not suffice to support Kenny's negligent misrepresentation claim, as such implied representations are not be the sort of positive statement or action upon which such a claim may be based. See Byrum v. Brand, 219 Cal.App.3d 926, 941, 268 Cal.Rptr. 609 (1990).
 
 
 49
 Moreover, while Tennenbaum did represent to the Daisy and Cadnetix boards that Bear Stearns was going to fund the transaction, a statement which may constitute the required "false positive assertion" necessary to support the claim, we must question the reasonableness of the reliance upon these statements. See Laks v. Coast Federal Savings & Loan Ass'n, 60 Cal.App.3d 885, 131 Cal.Rptr. 836 (1976)(holding that in an action for promissory estoppel, experienced businessmen could not reasonably rely on an ambiguous commitment to loan money). As Tennenbaum's assurances of financing were accompanied by no suggestion of the terms on which such financing would be granted, any reliance on them was certainly unreasonable. See, e.g., Jordan-Milton Machinery v. F/V Teresa Marie II, 978 F.2d 32, 36-37 (1st Cir.1992)(holding that it was unreasonable to rely on "vague exhortation[s]").
 
 
 50
 We affirm the district court's grant of summary judgment on the negligent misrepresentation claim.
 
 CONCLUSION
 
 51
 The district court held that it was merely a "failed business transaction" which lay at the bottom of this dispute. We have no quarrel with this proposition. However, the record in this matter suggests that Bear Stearns' role in that failure should be examined carefully before a trier of fact. Thus, we reverse the district court's grant of summary judgment on the professional negligence claim, and its denial of leave to amend the complaint to state a claim for breach of fiduciary duty. We affirm its grant of summary judgment on the negligent misrepresentation claim, and remand the matter to the district court for further proceedings consistent with this opinion. Each party shall bear their own costs.
 
 
 52
 AFFIRMED IN PART, REVERSED IN PART and REMANDED.
 
 
 53
 FERNANDEZ, Circuit Judge, concurring and dissenting:
 
 
 54
 It is impossible not to recognize that this is a case of biting off more than one can chew. Daisy was not satisfied with being a major player in the computer field; it decided to gobble up another major player--Cadnetix. It thought that it would then be an even bigger and more powerful company. Instead, it choked on the bite. Its trustee in bankruptcy is now looking for a deep pocket. Perhaps he has found it in the trousers of Bear Stearns.
 
 
 55
 The issue is close, but on the evidence presented it is just barely possible that a trier of fact will determine that Bear Stearns performed negligently and that the negligence led to the collapse of Daisy. That is so even though Daisy had designs on Cadnetix before it even contacted Bear Stearns; that Daisy did not even seek Bear Stearns' advice for the deal it actually finally consummated; that Daisy did not seek financing help from Bear Stearns until its attempts at self help created an almost impossible timing situation; and, finally, that it was Daisy which failed to conduct its business in a way that allowed it to meet even in its own financial projections. Still, I suppose a reasonable trier of fact could determine that Bear Stearns is responsible for Daisy's debacle, and that is the summary judgment test. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-52, 106 S.Ct. 2505, 2511-12, 91 L.Ed.2d 202 (1986).
 
 
 56
 However, Kenney reaches too far when he says that the facts could possibly support a breach of fiduciary duty claim. The district court, with that perceptive and informed sententiousness that often characterizes the work of our district judges, said that:
 
 
 57
 Merely because Bear Stearns was hired as an expert consultant to render financial services does not mean it was in a position of superiority in this relationship between two sophisticated business entities. Daisy's "complete" dependence on Bear Stearns, even if it is true, is unjustified and does not render Bear Stearns liable for an arms-length business transaction that has gone sour. In addition, the conclusory allegations that Daisy was somehow vulnerable to Bear Stearns or that Bear Stearns "exerted undue influence" over Daisy are unsupported....
 
 
 58
 Just so. Nothing in this case suggests that there was any fiduciary relationship whatever between these sophisticated entities or that Kenney can honestly plead one. Kenney's attempt to clothe Daisy in the weeds of a poor put-upon consumer of professional services borders on the ludicrous; I suspect that it is only in conditions of litigation that Daisy's high-powered executives would be willing to say that they were mere lambs under the protection of the shepherds at Bear Stearns. Finally, while there is at least some indication of negligence on the part of Bear Stearns, there is no indication of a breach of fiduciary duty.
 
 
 59
 Thus, with some misgivings, I agree that there may have been negligence. But to leverage this action into a fiduciary duty case breaks down all barriers between mere negligence and breach of fiduciary duty. Of course, I agree that the district judge properly granted summary judgment on the issue of negligent misrepresentation.
 
 
 60
 Therefore, I concur in part and dissent in part.
 
 
 
 [1]
 The letter defined a "transaction" as "(a) any merger, consolidation, reorganization, or other business combination pursuant to which the business of Cadnetix is combined with [Daisy] or (b) the acquisition by [Daisy] or any of its subsidiaries of all or a substantial portion of Cadnetix's assets, either directly or by acquisition of a subsidiary or division, or of effective control of Cadnetix, whether by way of tender or exchange offer, open market purchases, negotiated purchases or otherwise."
 
 
 [2]
 The Bear Stearns Commitment Committee is a committee of senior executives at the investment bank which reviews and approves significant firm undertakings, such as agreements to arrange financing
 
 
 [3]
 A "bridge loan" is a short term loan made to a borrower before long term financing has been arranged
 
 
 [4]
 The memo, addressed to Tennenbaum, stated:
 Bob Simms of Daisy called late last week to coordinate efforts with respect to obtaining necessary bank financing of $40-60 million in connection with the back-end merger of Cadnetix. Simms informed me that the cost savings/synergy financial information relating to the acquisition would be forthcoming in early December. I informed Simms that as soon as the information was ready, we would move speedily to arrange back-end financing.
 Tom Lord is fully informed on the Daisy situation and is eager to join us in this financing effort.
 
 
 [5]
 Kenny does not explicitly argue that the $130 million loan constituted a commitment to provide for long-term financing, but only that the terms of that loan could be "adjusted"